DEPARTMENT OF SOCIAL SERVICES v EMMANUEL
BAPTIST PRESCHOOL

Docket No. 79024. Argued January 6, 1988 (Calendar No. 4). Decided
April 9, 1990.

The Department of Social Services brought an action in the
Ingham Circuit Court against the Emmanuel Baptist Bible
Church and its preschool and day-care center, seeking a judg-
ment declaring the defendants to be subject to the require-
ments of the childcare organization act, 1973 PA 116, and
seeking to enjoin the defendants from operating a childcare
center without a license from the DSS. The defendants asserted
that the Legislature had improperly delegated licensing author-
ity to the DSS, that the act was unconstitutional under the First
Amendment as applied to them, and that certain administra-
tive rules pertaining to the running of the preschool and the
day-care center infringed upon their First Amendment rights.
The court, Thomas L. Brown, J., although finding that the
defendants' preschool and day-care center constituted reli-
giously grounded activity, held that the defendants were re-
quired to obtain a license to operate the programs on the
ground that the state's compelling interest in protecting chil-
dren in childcare centers outweighed the defendants' interest
in being free from state regulation. The court further held that
administrative rules relating to director qualifications, program
content, and corporal punishment, as well as statutory provi-
sions relating to inspection of financial records, should not be
applied to the defendants; rather, the state should develop and
employ less intrusive means of regulating church-operated day-
care centers. The Court of Appeals, Hood, P.J., and Holbrook,
Jr., and D. P. Kerwin, JJ., affirmed the licensure requirement,
but reversed the trial court's ruling on exemptions (Docket No.
77946). The defendants appeal.

In a memorandum opinion:

The Supreme Court unanimously *held:*

I. The Department of Social Services regulation prohibiting
corporal punishment is justified by a compelling state interest
and may be enforced.

With regard to the following issues a majority of the Court
*held:*

II. The First and Fourteenth Amendments of the United

States Constitution do not prevent the state from compelling the defendants to conform to the licensure requirements of the childcare organization act.

III. The state may not enforce the accreditation aspects of the program director qualifications rule, 1980 AACS, R 400.5104(2)(a), since to do so would violate the defendants' free exercise of religious beliefs.

IV. The state may not enforce the program content rule, 1980 AACS, R 400.5106(1)(c), because the rule is unconstitutionally vague and overbroad.

Justice CAVANAGH, stated that the state may require the defendant preschool to obtain a license pursuant to the terms of the childcare organization act; that the Department of Social Services either must exempt the defendants from the program director qualifications rule, 1980 AACS, R 400.5104, insofar as it requires that the director obtain minimal educational training only from a state accredited college or university, or must undertake an independent evaluation of the credentials of the program director to determine whether his qualifications satisfy the minimal educational criteria set forth in the administrative rule; that the program content rule, 1980 AACS, R 400.5106, is unconstitutionally vague on its face and may not be enforced against the defendants; that in order to protect members' rights of association under the First Amendment, the Department of Social Services, in applying the provisions of the act which give it authority to inspect financial records, may not request information from the defendants that reveals the source or identity of their financial support; and that the administrative rule prohibiting corporal punishment, 1980 AACS, R 400.5107, is justified by a compelling state interest and thus is enforceable against the defendants.

In analyzing a claim under the Free Exercise Clause of the First Amendment, the first inquiry is whether the claim is rooted in religious belief. While a religious belief must be based on more than purely secular or philosophically based personal beliefs, religiously motivated conduct need not stem from adherence to the tenets of a particular religion to enjoy Free Exercise Clause protection. A court should inquire into whether the belief is genuine or sincere, but need not decide the truth or reasonableness of the belief. The court must accept an organization's good-faith characterization of its activity as being grounded in religious belief. The party asserting the claim must show that a particular regulation burdens its practice of religion. A claimed burden may be deemed to be constitution-

ally insignificant, but only if the claimant's beliefs do not create an irreconcilable conflict between the mandates of the law and religious duty, or if the legal requirement does not directly coerce the claimant to act contrary to religious belief. Once it is established that a significant burden has been imposed by civil authority on the practice of a sincerely held religious belief, the state must prove a compelling interest that justifies both any direct burdens on religiously motivated conduct and any imposition upon individuals of a hard choice between religious belief and conformity to the legal obligation.

In this case, the burden of the licensure requirement is both direct and coercive so as to trigger strict scrutiny. The state met its burden of showing a compelling interest of the highest order in the general licensure requirement sufficient to justify the burdens on the defendants' free exercise of religion. It has also satisfied the burden under strict scrutiny of proving that the licensure requirement is the least restrictive alternative capable of accomplishing its objective. Thus, the defendants' request for exemption need not be granted. The department's program director qualification rule, however, is unconstitutional as applied to the defendants, and the DSS either must grant the defendants an exemption or undertake an independent evaluation of the defendants' program director's credentials to determine whether they satisfy the minimum criteria of the rule. The program content rule also is unconstitutional in that it is vague, fails to provide fair notice of expected conduct, is overbroad, and confers unstructured and unlimited discretion upon DSS officials.

Justice GRIFFIN, joined by Chief Justice RILEY and Justice LEVIN, stated that the Free Exercise Clause of the First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, precludes the state from compelling the defendants to be licensed under the child-care organization act and exempts the defendants from the provisions of the act which gives the DSS authority to inspect the defendants' finances in connection with the operation of their preschool/day-care program. In addition, the Department of Social Services administrative rules relating to director qualifications and program content should not be enforced against these defendants. The administrative rule relating to corporal punishment is constitutional.

In analyzing free exercise challenges, strict scrutiny is required. *Wisconsin v Yoder,* 406 US 205 (1972), remains good law and should be applied as directed in *Sheridan Road Baptist*

*Church v Dep't of Ed,* 426 Mich 462 (1986). The childcare organization act requires licensing of childcare facilities by the Department of Social Services and provides for criminal sanctions. In this case, it is not disputed that the defendants' objection to licensing is grounded in sincerely held religious belief. The record demonstrates that the defendants' practice of their religion is burdened by the act's licensing requirement. Under the strict scrutiny standard, the state does not meet its burden merely by showing a compelling interest in the general subject matter of a regulation; to override claims of religious exemption, it must demonstrate a compelling need to apply the regulation in a particular case.

In this case, the defendants concede that the state's interest in protecting the health and safety of young children is of the highest order. They do not object to regulations that directly relate to health, fire, sanitation, and other safety requirements. Rather, they reject the proposition that the state has constitutional authority to license a ministry activity. Nothing in the record indicates that exempting the defendants from the licensing requirement would impose a grave and immediate danger to the state's interest in protecting the welfare of the children involved. In addition, the record warrants the conclusion that the state's legitimate purposes could be achieved in this case by utilizing a less obtrusive form of regulation than licensing. Thus, the Free Exercise Clause precludes the DSS from requiring the defendants' preschool and day-care programs to be licensed under the childcare organization act.

With respect to the administrative rule for selecting program directors only from accredited colleges, the DSS failed to show any compelling basis for its refusal to recognize in these defendants an exemption from the requirement. As applied to the defendants, the rule should be held to be unconstitutional. The regulation requiring a program of daily activities providing opportunities for emotional development of children in childcare programs, including positive self-concept, is unconstitutionally vague on its face and should not be enforced. The defendants also should be exempted from the provisions of the act regarding financial disclosure. The DSS effectively conceded that it does not have a compelling interest in initial financial disclosure of license applicants and that it is able to make a determination regarding whether basic services are being provided at childcare centers without financial inspection. Application of the provisions to the defendants would violate their right to free exercise of religion. In regard to the regulation prohibiting corporal punishment, however, the state's interest

is clear and compelling and should be applied to the defendants despite the possible burden on religious conduct.

Justice BOYLE, joined by Justice BRICKLEY, stated that the DSS, consistent with constitutional guarantees, may require the defendants to comply with the licensure requirements of the childcare organization act and certain administrative rules promulgated under its authority in order to operate their preschool and day-care programs. Licensure and regulation are part of a neutral legislative scheme to provide minimum standards to protect young children being cared for outside their own homes.

Before a court applies the strict scrutiny, compelling state interest, and no less restrictive alternative formulation, it must evaluate the significance of any burden on the activity in question. In weighing the state's interest and the claimant's request for exemption, circumspection is the watch word. The existence of an effect on a sincerely held religious belief does not in and of itself require the state to demonstrate a compelling state interest.

Although the United States Supreme Court consistently has reiterated the strict scrutiny test, its application, other than in government benefit cases or in *Yoder,* suggests a distinct, although not fully articulated methodology. Rather than employing a mechanistic approach, the Court has engaged in a multifactored balancing process.

*Yoder* involved not merely an effect on religious activity, but a compulsion by the state to coerce the plaintiffs to act contrary to their religious beliefs. This case, however, involves a neutral regulation which indirectly conflicts with the defendants' belief and does not impose a burden which is significant in light of constitutional guarantees. On the basis of the minimal and indirect burden the licensure requirement imposes on the defendants' exercise of religion, the substantial state interest in protecting the health and welfare of preschool children being cared for outside their homes, and the logical nexus between the interest to be attained and the means of attaining it, or on the basis that there is no less restrictive alternative to satisfy the state's compelling interest, the state, consistent with constitutional guarantees, may require the defendants to comply with the licensure requirement.

The decision of the Court of Appeals that the defendants must operate a licensed day-care center and comply with the regulation prohibiting corporal punishment should be affirmed. Those portions of its opinion addressing the regulations regarding program director qualifications, financial inspection, and

program content should be vacated. The issue of program director qualifications is not ripe for review, the question regarding financial inspection is moot, and the program content rule is void on its face on the ground of overbreadth.

Justice ARCHER, concurred with Justice BOYLE's analysis and resolution of the issues regarding licensing, the program director, and financial disclosure, but concurred with Justice CAVANAGH with regard to the program content issue.

Affirmed in part and reversed in part.

150 Mich App 254; 388 NW2d 326 (1986) affirmed in part and reversed in part.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Christopher D. Dobyns,* Assistant Attorney General, for the plaintiff.

*Boothby, Ziprick & Yingst* (by *Lee Boothby* and *James M. Parker*) for the defendants.

MEMORANDUM OPINION. We granted leave in this declaratory judgment case to decide whether the State of Michigan, Department of Social Services, may constitutionally require the Emmanuel Baptist Bible Church and its preschool[1] to obtain a license and comply with certain administrative rules in order to operate their preschool and day-care programs. Defendant objects to the license requirement and to certain administrative rules promulgated pursuant to the childcare organization act, 1973 PA 116,[2] on the ground that the statute and rules violate its constitutional rights to religious freedom contained in the Free Exercise and Establishment Clauses of the First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment. The particular rules objected to are Rule

---

[1] For convenience, the entities are sometimes hereinafter referred to as the "defendant" or the "church."

[2] As amended by 1978 PA 438; 1980 PA 32, 232, 510; 1981 PA 126; 1984 PA 139. MCL 722.111 *et seq.*; MSA 25.358(11) *et seq.*

400.5104,[3] which sets educational qualifications for program directors; Rule 400.5106,[4] which requires day-care centers to provide a program for emotional development of children "including [a] positive self-concept;" and Rule 400.5107,[5] which prohibits corporal punishment.[6] The defendant also objects to §§ 2(3)(c) and 5(1) of the act, MCL 722.112(3)(c); MSA 25.358(12)(3)(c), and MCL 722.115(1); MSA 25.358(15)(1), to the extent that the provisions give the DSS authority to inspect the financial records of the defendant.

From September 15, 1974, to June 1, 1979, the church's preschool was licensed by the DSS to operate as a "childcare center" under 1973 PA 116 to care for twenty children from two and one-half through six years of age. During those years the format of the church's preschool and day-care programs varied somewhat. Initially, the preschool program was operated on a half-day, morning basis. By the time of application for the second renewal of a license in 1975, the defendant operated a full-day program, presumably as a day-care center, along with the preschool half-day program. In 1978, twenty to forty children were in the preschool and about ten children remained in the afternoon for day care.

On May 18, 1978, the defendant was issued a two-year license by the DSS. However, on May 3, 1979, the principal of the Emmanuel Baptist Preschool, Mr. Mark Asire, informed representatives of the DSS that the defendant no longer wanted its preschool and day-care center to be licensed. This

[3] 1980 AACS, R 400.5104.

[4] 1980 AACS, R 400.5106.

[5] 1980 AACS, R 400.5107.

[6] The administrative rules which govern childcare centers were promulgated pursuant to authority granted in the childcare organization act, MCL 722.112; MSA 25.358(12), effective June 4, 1980. 1980 AACS, R 400.5101 *et seq.*

assertion was subsequently confirmed by the church's pastor, Rev. Harold E. Asire. On November 8, 1979, the DSS "closed" the license of the preschool to operate as a childcare center, effective June 1, 1979. However, the church continued thereafter to conduct its preschool/day-care programs until the time of trial in December, 1982. From 1980 to 1982, twelve to twenty-eight children were in defendant's preschool or day-care programs.

The DSS filed the instant action against defendant on April 29, 1980, seeking a declaratory judgment that defendant is subject to the requirements of the childcare organization act, 1973 PA 116, and seeking a preliminary and permanent injunction enjoining defendant from operating or maintaining a childcare center without a license from the DSS. Defendant raised as affirmative defenses that the Legislature had improperly delegated licensing authority to the DSS, that the act was unconstitutional under the First Amendment as applied to defendant, and that the administrative rules enumerated above infringed upon its First Amendment rights.

Following a bench trial, the trial court issued a written opinion on January 19, 1984. The court specifically found that defendant's preschool and day-care programs constituted "religiously grounded" activity. Nevertheless, it held that defendant was required to obtain a license to operate its preschool/day-care programs on the ground that the state had a compelling interest in protecting children in childcare centers which outweighed defendant's interest in being free from such state regulation.

The trial court also decided, however, that the administrative rules relating to director qualifications, program content, and corporal punishment,

as well as the statutory provisions relating to inspection of financial records, should not be applied to this defendant. The court held that the state "should develop and employ less intrusive means of regulating a church-operated day-care center . . . . In all other respects Defendant Church should be required to obtain a license from [the] DSS and to comply with reasonable regulations of fire, safety and health requirements of the Act."

On appeal in the Court of Appeals, the DSS challenged that portion of the trial court's order which held that defendant was exempt from particular rules and statutory provisions. Defendant filed a cross-appeal challenging the underlying licensing requirement of the act.

In its opinion, the Court of Appeals agreed with the circuit court that the defendant's "claim is undoubtedly rooted in [its] fundamentalist Christian doctrine. Moreover, regulation poses some burden on the free exercise of religion . . . ." 150 Mich App 254, 264; 388 NW2d 326 (1986). However, the Court of Appeals found that the state's interest in protecting children outweighed the burden imposed on the defendant's First Amendment rights. The Court of Appeals thus affirmed the trial court's requirement of licensure but reversed the trial court's ruling on exemptions. We then granted leave to appeal. 428 Mich 909 (1987).

A unanimous Court holds that the regulation prohibiting corporal punishment is justified by a compelling state interest and may be enforced.

A majority of the justices is of the opinion that

(1) The First and Fourteenth Amendments do not prevent the state from compelling the defendant to conform to the licensure requirements of the childcare organization act.

(2) The state may not enforce the accreditation

aspects of the program director qualification rule, 1980 AACS, R 400.5104(2)(a), since to do so would violate the free exercise of religious beliefs of the defendants.

(3) The state may not enforce the program content rule, 1980 AACS, R 400.5106(1)(c), since the rule is unconstitutionally vague and unconstitutionally overbroad.

The Court does not decide whether the financial disclosure provisions violate the defendants' rights of the free exercise of religion and freedom of association, since the state has not exercised its statutory authority to compel financial disclosure, making these issues unripe for review.

At least four justices concur in every holding statement.

Riley, C.J., and Levin, Brickley, Cavanagh, Boyle, Archer, and Griffin, concurred.

Cavanagh, J. (*concurring*). I conclude (1) that the state may require defendant preschool to obtain a license pursuant to the terms of the child-care organization act; (2) that the Michigan Department of Social Services either must exempt defendants[1] from the program director qualifications rule (1980 AACS, R 400.5104) insofar as it requires that the director obtain minimal educational training only from a state accredited college or university or must undertake an independent evaluation of the credentials of defendants' program director to determine whether his qualifications satisfy the minimal educational criteria set forth in Rule 104; (3) that the program content rule (1980 AACS, R 400.5106) is unconstitutionally

[1] The defendants are Emmanuel Baptist Bible Church and its preschool. For convenience, the entities are sometimes hereinafter referred to as the "defendant" or the "church."

vague on its face and may not be enforced against the defendants; (4) that in order to protect the defendants' (members') rights of association under the First Amendment, the DSS, in applying the provisions of the act which give authority to the DSS to inspect defendants' financial records, may not request information from the defendants that reveals the source or identity of the defendants' financial support; and (5) that the administrative rule (1980 AACS, R 400.5107) prohibiting corporal punishment is justified by a compelling state interest and therefore enforceable against defendants.

I write separately to join Justice GRIFFIN's "concurring" opinion[2] to form a majority on the issue of the Free Exercise Clause standard of review,[3] the issue whether the defendants' claims regarding the licensing rules are ripe for review, and the issue whether the licensing rules are unconstitutional.[4] I also write separately to join the dissenting opinion (BOYLE, J.)[5] to form a separate majority

[2] All references to "concurrence" and "concurring" opinion are to the opinion of Justice GRIFFIN. I recognize that this opinion is in the "dissent" on certain issues: (1) whether defendants can be required to be licensed, (2) whether the Court should decide if the financial disclosure regulations infringe upon the free exercise of religion, and (3) whether the program content rule, R 400.5104(2)(a), violates defendants' free exercise of religion.

[3] I agree in principle with the concurrence about the proper application of the standard of review. We differ only on the result in this case, that is, whether, on this record, registration is an alternative, less drastic means of accomplishing the state's interests. Our disagreement on this issue is limited to whether the state has produced sufficient evidence to justify refusing to exempt the defendants from the license requirement.

[4] While I agree with the concurrence that (1) the application of Rule 104 is unconstitutional, and (2) that the challenged portions of Rule 106 are unconstitutional, my reasoning differs in many respects from that of the concurrence. Also, I agree with the concurrence that the statutory financial disclosure requirements pose a risk of "chilling" the defendant church's First Amendment rights, but I do not decide the merits of that claim.

[5] All references to "dissent" and "dissenting" opinion are to the opinion of Justice BOYLE. I recognize that this opinion is in the majority on certain issues.

on the issue whether the license requirement is constitutional as applied.[6]

## I. STANDARD OF REVIEW TO BE APPLIED TO FREE EXERCISE CLAIMS

### A. INTRODUCTION

The religion clauses of the First Amendment of the United States Constitution[7] encompass two distinct but interrelated concepts—the guarantee of free exercise of religion by all persons, and the prohibition of the establishment of religion by government. I am primarily concerned here with the free exercise facet of the First Amendment.

In *Sheridan Road Baptist Church v Dep't of Ed*, 426 Mich 462; 396 NW2d 373 (1986), cert den 481 US 1050; 107 S Ct 2183; 95 L Ed 2d 839 (1987), this Court divided equally and affirmed a holding by the Court of Appeals that a statute requiring nonpublic school teachers to be certified by the state is constitutional. The three opinions in *Sheridan Road* recognized the four basic elements of the Free Exercise Clause standard of review described by Justice WILLIAMS, 426 Mich 475, though each opinion applied that standard differently. I write separately, in part, to discuss the proper application of the standard.

### B. ELEMENTS OF THE STANDARD

The first inquiry is whether the free exercise

---

[6] I agree with the dissenting opinion (BOYLE, J.) on this issue, however, only with respect to the result.

[7] The First Amendment of the United States Constitution in pertinent part provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .

claim is "rooted in religious belief," *Wisconsin v Yoder,* 406 US 205, 215; 92 S Ct 1526; 32 L Ed 2d 15 (1972). A religious belief must be based on more than purely secular or philosophically based personal concerns to be protected by the First Amendment, *id.* at 215-216. Religiously motivated conduct need not stem from adherence to the tenets of a particular religious organization, however, to enjoy the protection of the Free Exercise Clause, *Frazee v Illinois Dep't of Employment Security,* 489 US 829, —; 109 S Ct 1514; 103 L Ed 2d 914, 920 (1989).

While a court may inquire into whether a religious belief is genuine or sincere, it should not decide the "truth" or "reasonableness" of the belief. *United States v Ballard,* 322 US 78; 64 S Ct 882; 88 L Ed 1148 (1944). As explained by the Court in *Thomas v Review Bd Ind Employment Security Div,* 450 US 707, 714; 101 S Ct 1425; 67 L Ed 2d 624 (1981):

> The determination of what is a "religious" belief or practice is more often than not a difficult and delicate task . . . . However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

In sum, the Court must accept an organization's good-faith characterization that its activity is grounded in religious belief because "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v Comm'r of Internal Revenue,* 490 US —; 109 S Ct 2136; 104 L Ed 2d 766, 786 (1989) (citation omitted).

Assuming the sincerity of a claimant's religious

beliefs, the party asserting a free exercise claim must show that a particular regulation burdens its practice of religion. *Tony & Susan Alamo Foundation v Secretary of Labor,* 471 US 290, 303; 105 S Ct 1953; 85 L Ed 2d 278 (1985); *United States v Lee,* 455 US 252, 256-257; 102 S Ct 1051; 71 L Ed 2d 127 (1982). The question is whether the "affected individuals [would] be coerced by the Government's action into violating their religious beliefs . . . [or whether] governmental action [would] penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng v Northwest Indian Cemetery Protective Ass'n,* 485 US 439, 449; 108 S Ct 1319; 99 L Ed 2d 534 (1988).

A substantial burden was shown in *Yoder* because the school attendance law pressured the claimant with severe penalties to forego activity mandated by the claimant's religious beliefs. There is an equally significant constitutional burden on religious belief if the law compels conduct that is contrary to religious faith, see, e.g., *Sherbert v Verner,* 374 US 398, 404, 406; 83 S Ct 1790; 10 L Ed 2d 965 (1963); *Lyng, supra* at 448-449.

A claimed burden on religious beliefs may be deemed constitutionally *in*significant, but only (1) if the claimant's beliefs do not create an irreconcilable conflict between the mandates of law and religious duty, or (2) if the legal requirement does not directly coerce the claimant to act contrary to religious belief, *Jimmy Swaggart Ministries v California Bd of Equalization,* 493 US ___; 110 S Ct 688; 107 L Ed 2d 796 (1990);[8] *Hernandez v Comm'r of*

---

[8] Our cases have established that "[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v Comm'r [of Internal Revenue],* 490 US —,

*Internal Revenue, supra; Tony & Susan Alamo Foundation, supra.*

In *Jimmy Swaggart Ministries, supra,* there was no evidence that the collection and payment of the sales tax violated the appellant's sincere religious beliefs. In *Hernandez v Comm'r of Internal Revenue, supra,* 104 L Ed 2d 786, the claimant's religious beliefs, unlike those in this case, did not forbid entirely compliance with the law (i.e., receiving or paying taxes for the religious sessions). The Court found that the denial of a tax deduction to the Church of Scientology for expenses incurred in conducting "auditing or training sessions" did not impose a substantial burden on the claimant's faith.[9] In *Tony & Susan Alamo Foundation, supra,* there was no necessary conflict between law and religious duty, making it unnecessary to order a Free Exercise Clause exemption.

In all these cases, the Court evaluated the claimants' assessment of the religious nature of the conflict between law and religious faith, rather than imposing an objective evaluation of the degree of burden on the claimant. For example, in *Hernandez, supra,* 104 L Ed 2d 786-787, rather than substituting its own objective analysis of the degree of burden imposed on the activity (i.e., to avoid strict scrutiny of the regulation), the Court accepted the claimant's characterization of the degree of burden and applied strict scrutiny.

Once it is established that a substantial burden has been imposed by a civil authority on the practice of a sincerely held religious belief, the

—; 109 S Ct 2136 [2148]; 104 L Ed 2d 766 [786] (1989) (citations omitted). [*Id.* at 107 L Ed 2d 806.]

[9] The claimant in *Hernandez* also argued that the effect of the denial of a tax deduction was to make the practice of religion more expensive, but that is not a direct burden on religious beliefs and was deemed insufficient to require the application of strict scrutiny.

state must prove a compelling interest that justifies both (1) any direct burdens on religiously motivated conduct, and (2) the imposition upon individuals of a "hard choice" between religious belief and conformity to a legal obligation because of their religious beliefs. See *Hobbie v Unemployment Appeals Comm of Florida*, 480 US 136, 141-142; 107 S Ct 1046; 94 L Ed 2d 190 (1987).[10]

### C. APPLYING THE STANDARD

No balancing of interests is required if accommodation of that burden would not unduly impair or materially detract from the furtherance of compelling state interests.[11] It is the state's burden to prove that there are no alternative, less drastic

[10] See also *Sheridan Road Baptist Church v Dep't of Ed, supra* at 519-521, 540-544, 554-558, 566-579 (Riley, J.) (stating the standard of review and discussing how it must be applied); *Yoder, supra* at 215; *Thomas, supra* at 718; *Bowen v Roy*, 476 US 693, 728-732; 106 S Ct 2147; 90 L Ed 2d 735 (1986) (O'Connor, J.).

[11] Accord *New Life Baptist Church Academy v East Longmeadow*, 666 F Supp 293, 313 (D Mass, 1987), rev'd 885 F2d 940 (CA 1, 1989), cert den 494 US —; 110 S Ct 1782; 108 L Ed 2d 784 (1990). The District Court for Massachusetts stated:

> Balancing necessarily entails particularly subjective judgments [which] [s]trict scrutiny [avoids by] mak[ing] the decisive question the more objective issue of whether the state is employing the least restrictive means of satisfying its interest . . . [and, so] the court is not authorized to balance *its perception of the burden on the exercise of plaintiffs' religious beliefs* against its assessment of the importance of the state's competing interest to determine who should prevail in this case. [Emphasis added.]

See also *id.* at 885 F2d 945-946 (affirming the trial court's finding that the state approval process burdened the plaintiff's sincerely held religious beliefs, making strict scrutiny applicable).

The decision of the United States Court of Appeals for the First Circuit in *New Life Baptist Church* held that the state-approval regulations for private schools were valid because they were the least restrictive form of regulation to accomplish a "compelling" state interest, see 885 F2d 944-945, 947-952.

See also *Sheridan Road, supra* at 519, n 5, 561-564, and 580 (Riley, J.) where, on facts similar to *New Life Baptist Church*, three mem-

means to accommodate the free exercise claim. See *Sheridan Road, supra* at 540-544 (RILEY, J.); see also *Yoder, supra* at 215 (only state interests "of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion").

Of course, it is true that "[not] all burdens on religion are unconstitutional," *United States v Lee, supra* at 257. But this conclusion must be reached after applying strict scrutiny. The United States Supreme Court has consistently applied strict scrutiny where a law compelled conduct in violation of a sincerely held religious belief, see *Sherbert v Verner* and *Wisconsin v Yoder, supra.*[12] In fact, in *Lee,* the Court specifically rejected the use of an "objective burdens" analysis as a threshold requirement preliminary to applying strict scrutiny balancing analysis.[13]

In a more recent case, *Bowen v Roy,* 476 US 693; 106 S Ct 2147; 90 L Ed 2d 735 (1986), a majority of the Court determined that strict scrutiny balancing analysis must be applied to decide the constitutionality of requiring an applicant for welfare benefits to submit a number in order to receive benefits if that act violates the applicant's sincerely held religious belief.[14] The *Bowen* Court

bers of this Court would have mandated an exemption from the state certification requirements.

[12] See, generally, Pepper, *The conundrum of the Free Exercise Clause—Some reflections on recent cases,* 9 N Ky L R 265 (1982).

[13] Pepper, n 12 *supra* at 284-285 (*Lee* avoided holding that the Amish were not sufficiently "burdened" to benefit from strict scrutiny).

I am aware that the above commentator acknowledges that *Yoder* can be read more narrowly.

[14] See *id.* at 476 US 712-716 (Blackmun, J., concurring in part); 476 US 724-732 (O'Connor, J., joined by Brennan and Marshall, JJ., concurring in part and dissenting in part). Justice White dissented in *Bowen,* 476 US 733, ostensibly on the ground that the claimants were entitled to an exemption from the social security number requirement under the holdings of *Thomas* and *Sherbert, supra.*

ordered that, on remand, the claimant, Stephen Roy, must be exempted from the duty to supply the number (assuming the dispute remained justiciable).[15] The burden that the licensing law imposes on defendants in this case is analogous to the burden imposed on claimant Stephen Roy, at least as to the second issue addressed in *Bowen, supra* at 727 (O'Connor, J.) (partial concurrence).[16]

Even more recently, in *Lyng, supra,* the Court made it clear that it is not applying a new version of strict scrutiny, and has not adopted a threshold burden requirement for all Free Exercise Clause cases. In *Lyng, supra* at 457-458, the Court applied a threshold burden analysis to determine the degree to which a law burdened the claimant's religious practices. *Lyng* involved no direct legal coercion which forced the claimant to act in a manner contrary to a religious belief.[17] Moreover, the Court sought to foreclose a broad reading of its *Lyng* decision by including the proviso that the case would be decided differently if the destruction of sacred lands had directly coerced the claimants to act contrary to their religious beliefs, *id.* at 453.[18]

[15] See, generally, 3 Nowak, Rotunda & Young, Constitutional Law (Supp 1989, pp 72-75).

[16] Since the burden imposed here on defendants is analogous to the burden imposed in *Bowen,* the dissent's reliance upon that case is inapposite, see *post,* pp 461–462 (BOYLE, J.).

The burden imposed by licensure is also at least as great, if not greater, than the burden imposed by the compulsory reading program analyzed in *Mozert v Hawkins Co Bd of Ed,* 827 F2d 1058 (CA 6, 1987), cert den 484 US 1066; 108 S Ct 1029; 98 L Ed 2d 993 (1988). I cite the *Mozert* decision only as authority on the issue whether the law burdened religious activity, and do not express an opinion on the Court's application of strict scrutiny.

[17] Strict scrutiny was not applied in *Lyng* because the claimants had no claim to undisturbed and exclusive access to federal lands containing sacred sites, see *id.* at 448-450, 453-454 (O'Connor, J.). Thus, the destruction of those sites did not coerce or compel them to act contrary to their religious beliefs. See further discussion below at 399.

[18] [A] law prohibiting the Indian respondents from visiting the

Because *Lyng* was limited by the language of the decision to its facts, it is readily distinguishable from this case. The claimants in *Lyng* sought access to sacred Indian sites on lands that they did not own or have any legal right to use. By contrast, the defendants here are affirmatively compelled to submit to a license requirement that directly infringes upon religiously motivated activity.

Since strict scrutiny has consistently been applied in cases where the challenged statute or regulation directly coerces the defendant to violate religious beliefs "under pain of criminal penalty," see *Bowen, supra* at 706, n 16 (Burger plurality), *Yoder, supra* at 207-209, 223, and *Lyng, supra* (O'Connor, J.), it must be applied here as well. But, it must be applied properly.

The dissent applies a version of strict scrutiny— the "substantial state interest test"—that is not consistent with established law, see *post,* pp 455, n 4, 456, n 5, and 466–467 (Boyle, J.). This standard departs from established precedent in at least two respects. First, it improperly places the burden of proof on the free exercise claimant in establishing the existence of less restrictive alternatives. Second, it does *not* place the burden on the state of showing that there are no less restrictive alternatives that can accommodate the claimant's burden.[19] *Yoder* remains good law, and must be applied here in the manner as described in *Sheridan Road, supra* at 574-578 (Riley, J.).

---

Chimney Rock area would raise a different set of constitutional questions.

[19] For a statement of the proper allocation of the burden of proof, see *Hobbie, supra* at 141-142 (Brennan majority).

In *Sheridan Road, supra* at 574-576 (Riley, J.), we rejected the dissent's unduly narrow reading of the standard of strict scrutiny articulated in *Yoder* and *Lee, supra.* The strict scrutiny test applied by the dissent in this case is flawed for the same reasons.

### D. OBJECTIVE ANALYSIS OF BURDENS

The dissent takes the position that strict scrutiny need not be applied to the licensing requirement because the burdens imposed on defendants' religious beliefs are not constitutionally significant.[20] Yet, the dissent offers no clear standard or methodology by which this Court can, on this record, reject the defendant's sincerely held religious belief that the licensure requirement compels it to violate a religious duty.[21]

While the dissent relies upon *Lyng, supra,* to avoid the demands of strict scrutiny, *post,* p 456 (Boyle, J.), the case cannot be extended to the type of burden that licensing imposes on the defendants' religious beliefs.[22] The *Lyng* majority expressly declined to disturb prior cases which applied strict scrutiny on facts much more similar to the facts present here.[23]

To substitute an objective judicial determination of the degree of burden imposed by the licensure requirement for the religious beliefs articulated by the claimants, as the dissent has done, would inject this Court into the realm of theologians. Such an "objective burdens" analysis, if adopted, would eventually create a body of law giving

[20] *Post,* p 463 (Boyle, J.).

[21] *Post,* pp 458-463 (Boyle, J.).

[22] Applying *Lyng* to this case is inappropriate because the burdens involved in the two cases are clearly distinguishable, see discussion *supra* at 397-398, and n 17.

[23] See *Lyng, supra* at 450 ("this Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibition, are subject to scrutiny under the First Amendment"), and *id.* at 451 ("[we refuse to draw the] exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government *of its own affairs*").

See also *Yonkers Racing Corp v City of Yonkers,* 858 F2d 855, 871 (CA 2, 1988), and *North Dakota v Anderson,* 427 NW2d 316, 325-327 (ND, 1988) (Meschke, J., dissenting) (discussing the limits of the *Lyng* decision).

greater weight to some burdens than to others. Under this approach to the Free Exercise Clause, there is a distinct danger that the protection of religious freedom will be limited to those religious groups whose identity or convictions are familiar to and accepted by the members of the court deciding a free exercise claim.

## II. GENERAL LICENSURE REQUIREMENT

The defendants-appellants claim that the state impermissibly burdens the free exercise of their religious belief by requiring a license before the church may engage in its childcare ministry. Since we hold that the First Amendment requires that defendant be protected from the coercive burdens that licensure imposes, we must determine if the license requirement can survive the exacting demands of strict scrutiny.

### A. DEFENDANTS' INTEREST

According to defendants' religious beliefs, it is sinful to submit to a license in order to practice their day-care ministry. Being forced to accept the submission that licensure connotes, the defendants' doctrinal autonomy is offended:

It is the function of a license that causes the religious objection. . . . Submitting to licensing is seen as submitting a religious ministry commanded by God to the authority of the state to decide whether or not the activity may be conducted. The state's own expert witness on licensing explained the philosophy of licensing as "the administrative lifting of a legislative prohibition."

I assume, as did the trial court, that defendants'

religious objection to submitting to a licensing statute is sincere. See *post*, pp 432-433 (GRIFFIN, J.).

Turning to the question whether the licensing requirement burdens the exercise of defendants' religious belief, I conclude that the burden is coercive in the required sense so as to trigger strict scrutiny.[24] The defendants may go to jail if they follow their religious beliefs instead of submitting to the licensure requirement.[25]

There is ample support in the record for the conclusion that it is, the defendants' belief that licensure of their day-care ministry would be a sin contrary to church doctrine. The defendants object to licensing because they think submission to a license amounts to what the Bible defines for them as a form of "Moloch worship."[26]

The defendant church offers a scriptural basis for its more general objection to licensure, and, of course, "[c]ourts are not arbiters of scriptural in-

[24] The coercion that results from the license requirement is explicitly set forth in the statute, see MCL 722.125; MSA 25.358(25). The defendants may be subjected to criminal prosecution for failure to obtain a license, or the failure to comply with the DSS regulations may result in license revocation or misdemeanor penalties including "*a fine* of not less than *$100.00* nor more than *$1,000.00*, or *imprisonment* for not more than *90 days*, or both [eff. July 20, 1980]." (On April 29, 1980, when the DSS filed its complaint, the maximum punishment for violations of the act were "fine[s] not less than $25.00 nor more than $100.00, or imprison[ment] for not less than 30 days nor more than 90 days, or both.")

These penalties are designed to coerce compliance with the act's licensing and other requirements.

[25] The defendants only other alternative would be to leave the state, but that kind of forced migration would offend the constitution unless justified by a compelling state interest that has passed the demands of strict scrutiny. See *Sheridan Road, supra* at 553-554, and n 47.

[26] Indeed, there is substantial testimony in the record documenting the historical and scriptural basis of the defendants' religious view of licensure as a form of submission to a secular authority that amounts to "Moloch worship" and which their reading of the Bible proscribes. See testimony of Dr. Rushdoony. The fundamentalist Christian aversion to such submission has its origins in biblical times, but also stems from the experience of Baptists in colonial America who faced religious repression for failing to submit to the licensing of their religious ministers. *Id.*

terpretation." *Thomas, supra* at 716.[27] Dr. Rush-
doony testified that the operation of a day-care
ministry has become central to the exercise of the
defendants' religion. According to his testimony,
the day-care center, as an "instrument of evangeli-
zation," has also become essential to the very
survival of the church as a growing religious com-
munity.

The testimony taken during trial reveals why
defendants believe licensing of their day-care cen-
ter to be a violation of a religious duty.[28] The
operation of the day-care center is an act of reli-
gious worship for the church. The day-care center
functions both as a forum for religious instruction
and as a forum for evangelization (i.e., by bringing
new membership into the church). The defendants
view licensing of their day-care center as intrusive
upon their evangelical and worship ministry.
Their faith dictates that they may not submit that
ministry to a licensing agent of the state.

The defendants are offended by the legal man-
date to obtain a license for their day-care center,

---

[27] When asked by defense counsel whether licensing violates church
doctrine, Dr. Rushdoony testified that it did:

> *Q.* You mentioned in your previous testimony about how one
> of the sins during the great abomination was worship of the
> sovereign or worship of the king. From the standpoint of your
> church theology, is it a matter of religious doctrine historically
> that acceptance of licensing *of an aspect of the ministry* is a
> commission of the sin, the abomination, worshiping of the king?
>
> *A.* It is a form of Moloch or Baal worship, yes, and this has
> been the historic position of the church.

[28] Pastor Asire testified, in answer to the question whether God has
commanded the church to operate a childcare center or preschool,
that it is a biblical mandate to teach the word of God to children.
Further, he testified that the preschool ministry was an integral part
of the whole ministry of the church, and that a day-care center
license was inherently incompatible with fulfilling a duty to God.
Finally, he testified that it violates the religious convictions of church
members to submit to such licensing because "[w]e have this directive
from the Lord of teaching."

but are not offended by a license for driving a motor vehicle or a license to insure the safety of their buildings. The defendants do not object to safety regulations because the licensing of their secular activities does not infringe upon the practice of religion. The defendants have drawn religious distinctions between different kinds of licenses because they view the activity which the license regulates very differently. "[I]n every sense, [licensure] affirmatively compel[s] [the defendant church], by threat of sanctions, to refrain from religiously motivated conduct or to engage in conduct that [it] find[s] objectionable for religious reasons," *Sheridan Road, supra* at 553-554, and n 48 (Riley, J.) (citations omitted).[29]

The record does not support the dissent's characterization of defendants' religious beliefs and of how those beliefs are burdened.[30] This characterization ignores the religious meaning to defendants of submitting the operation of a day-care ministry to a state licensing authority and thereby exceeds the restraints on our interpretative role suggested by the United States Supreme Court in *Hernandez, supra,* 104 L Ed 2d 786.

To summarize, the burden imposed by licensure of the day-care center must be analyzed under strict scrutiny because (1) the day-care ministry cannot be operated without a license, and (2) the state is unwilling to adopt an alternative form of regulation to accommodate the defendants' religious concerns. Given the nature of the defendants' sincerely held religious objection to licen-

[29] The term "licensure," for purposes of this discussion, includes both (1) the requirement of a license, and (2) certain preconditions which must be complied with to obtain a license. See *post,* pp 404-405.

[30] The dissent concludes that the defendants' objection to licensure is based solely on the fact that the license requirement gives the state the "power to withdraw approval," *post,* p 466 (Boyle, J.). See also pp 460-461, 462-463 (Boyle, J.).

sure, it is clear as a matter of " 'constitutional
fact,' " *post,* p 463 (Boyle, J.), that the burden
imposed by licensure is both direct and coercive so
that strict scrutiny must be applied to analyze the
constitutionality of the state's restriction on defendants' religious practices, see *Hobbie, Sherbert,*
and *Thomas, supra,* and *Bowen, supra* at 727
(O'Connor, J.) (partial concurrence).

### B. THE STATE'S INTEREST

I conclude that the state has met its burden of
showing a compelling state interest. Moreover, the
state has met its burden of showing the existence
of its interest in licensing, which is " 'of the highest order,' " *Thomas, supra* at 718; *Sherbert v
Verner, supra* at 405 (defining what constitutes a
"compelling state interest"). A compelling state
interest attends the imposition of some type of
license or registration requirement on child daycare centers. At oral argument, even defendant
agreed that a license or registration certificate is
necessary to make sure that no childcare institution falls below a certain level of performance
with respect to the obvious criteria of health and
safety. In order to vindicate its interest in prohibiting unsafe or unhealthy conditions in day-care
centers,[31] the state must assert its authority over
those centers before they can be allowed to operate. The state cannot determine if minimum standards are met unless it has a regulatory mechanism that allows it to inspect those aspects of the
management of any childcare facility which might
pose reasonably foreseeable harm to children. The

---

[31] Admittedly, a " 'grave and immediate' danger" has not been
demonstrated as presently existing at any specific group of day-care
centers. See *post,* p 439 (Griffin, J.). Yet, no such harm must be
shown since it is reasonable to assume the existence of these conditions will give rise to legitimate state concern in the future.

failure of even one day-care center to submit to prior on-site or random inspections creates a possibility of serious harm to children unable to protect themselves.

## C. NO LESS RESTRICTIVE ALTERNATIVE

I also find that the state has carried its burden of showing that the license requirement is the least restrictive alternative capable of accomplishing the state's legitimate objective. The state produced adequate evidence proving that licensing, compared to registration, is a superior method of achieving compliance with fire, health, and safety rules;[32] indeed, licensing is essential to the achievement of compelling state interests in all child day-care centers.[33]

The concurrence concludes that "a different scheme of regulation," such as the registration of unapproved government-run day-care centers, could be employed as an alternative to licensing, *post,* p 442 (GRIFFIN, J.). While registration may be a " 'less obtrusive form of regulation' than licensing, *Sherbert, supra,* 374 US 407," *post,* p 442 (GRIFFIN, J.), it does not accomplish the state's compelling interests. The specific registration program that the defendant church proposed as a less

[32] According to the DSS Director of the Bureau of Regulatory Services, Dr. Gazan, registration does *not* involve prior on-site inspections before a "family day-care home" (involving supervision of one to six children) may begin to operate. During the ninety-day period after "registered" day-care operators receive their certificate, the DSS has discovered that fifty percent of all family day-care homes are *not* in compliance with DSS rules.

[33] The state's expert, Dr. Richard Ruopp, contended that the risk of harm to children in family day-care homes (which are registered instead of being licensed) is *greater* than the risks present in licensed day-care centers. Dr. Ruopp explained that licensing of such "registered" "family day-care homes" has not been implemented by the DSS only because the agency lacks the budgetary resources to regulate these smaller day-care facilities more intensively.

restrictive alternative cannot accomplish the state's compelling interests adequately since it makes no explicit provision for either *prior* on-site inspection or random spot inspections by DSS personnel.[34] Thus, registration is not an adequate substitute for licensing.

The dissent concludes that the defendant's claim of burden regarding some forms of registration but not others is "difficult to understand," *post,* pp 465-466 (BOYLE, J.). The incomprehensibility of a religious belief, however, is no reason to refuse to accord it the protection of the First Amendment.[35]

On this factual record, it is not possible to determine if registration as a form of regulation burdens defendant's sincerely held religious beliefs.[36] Since registration would not achieve the state's compelling interests, it is unnecessary to address the degree to which registration burdens the defendant's religious beliefs.

Therefore, I reject the defendants' claim that they are entitled to be exempt from the license requirement. The state's interest in licensing is compelling enough to justify the burdens on defendants' free exercise of religion that licensing and registration impose. Because the state has satisfied

[34] Dr. Ruopp testified on behalf of the state that registration is an inadequate substitute for licensing for two reasons. First, inspections need to be made on a periodic and random basis both before a day-care center opens and throughout its operation. The registration program as implemented by DSS for "family day-care homes," does not require prior on-site inspections, requires no further routine inspection during the three-year period of the registration certificate, and the DSS can only randomly inspect ten percent of all registered day-care homes. Second, the risk of harm to children is present in all day-care centers, including those operated by churches.

[35] See *Lyng, supra* at 458 (O'Connor, J.) (courts may not hold that a claimant misunderstands its own religious beliefs).

[36] While the dissent correctly states that defendants did not allege registration to be a burden, *post,* p 466, n 21 (BOYLE, J.), the opinion fails to state that the defendants also never stated explicitly that registration does *not* burden their beliefs.

its burden under strict scrutiny of proving with evidence that there are no alternative, less drastic means of regulation to accomplish the state's interest, the defendants' request for an exemption from the licensing requirement need not be granted.[37]

### III. PROGRAM DIRECTOR QUALIFICATION RULE 104

The defendants challenge the constitutional validity of the accreditation requirement in the program director qualifications rule.[38] The pertinent language of Rule 104(2) specifies:

(a) A program director shall have completed a minimum of 60 semester hours of credit at an accredited college or university and shall have completed not less than 12 semester hours in child development, child psychology, or early childhood education. . . .

(b) A program director shall have been awarded the child development associate credential by the child development associate consortium and shall have completed not less than 12 semester hours in child development, child psychology, or early child-

---

[37] Although not controlling, several decisions, with varying analyses, from other jurisdictions support this conclusion. See *Roloff Evangelistic Enterprises, Inc v State,* 556 SW2d 856 (Tex Civ App, 1977), app dis 439 US 803 (1978), reh den 439 US 998 (1978); *Texas v Corpus Christi People's Baptist Church, Inc,* 683 SW2d 692 (Tex, 1984); *State ex rel Pringle v Heritage Baptist Temple, Inc,* 236 Kan 544; 693 P2d 1163 (1985); *Kansas v Heart Ministries, Inc,* 227 Kan 244; 607 P2d 1102 (1980), app dis for want of a substantial federal question 449 US 802 (1980). A decision by a state supreme court which is summarily affirmed by the United States Supreme Court is an affirmance of the judgment, but the rationale given by the lower court may not be controlling. See *Metromedia, Inc v San Diego,* 453 US 490, 498-500; 101 S Ct 2882; 69 L Ed 2d 800 (1981).

[38] Pastor Asire did not object to the sixty credit requirement or the rule that a certain number of a program director's credits must be in early childhood education. Thus, I do not address the separate issue whether the state may impose minimum educational qualifications on staff directors at private preschools. There are not adequate facts on this record to decide that issue even if it were in dispute.

hood education at an accredited college or university.

## A. JUSTICIABILITY

1. *The Factual Record:* The record reflects that the defendants employed program directors from unaccredited institutions. The defendant church returned its license, in part, due to the "accreditation problem," as well as to avoid the inherent conflict between licensure and the church's religious beliefs.[39] The record also reflects that the defendant indicated a willingness to violate the terms of Rule 104 after extensive consultations with the plaintiff regarding the accreditation aspects of the rule. The DSS refused to provide a license to defendants, in part because they employed program directors who had received degrees from unaccredited schools (and who, as a result, were found not to be in compliance with 1979 AC, R 400.121[3]).[40] Finally, it is clear that the removal

[39] The parties have stipulated to the following facts. When the defendants were issued their first provisional license by plaintiff in 1974, the day-care center was in violation of the administrative rule regarding the qualifications of the program director. The second and third provisional licenses were issued pending compliance with this requirement. After a regular license was issued, the defendants notified plaintiff of their intent to discontinue the license, and the license was soon thereafter revoked by plaintiff in 1979.

[40] The dissent has ignored the prior agency enforcement efforts in concluding that there is no factual basis that the DSS sought to enjoin operation of the defendants' day-care facility due to noncompliance with Rule 104, *post,* p 468 (BOYLE, J.).

The record of agency enforcement of the predecessor regulation, R 400.121(3), clearly shows that the DSS interpreted the accreditation aspects of Rule 104 in conformity with its past practice of interpreting R 400.121(3).

As early as August 27, 1975, the agency cited defendants for violations of Rule 400.121(3). For instance, the defendants were cited to be in violation of the rule because they employed a program director from Grand Rapids School of the Bible and Music, an unaccredited college in Michigan. The agency also sought to condition the granting of a final license to defendants upon their compliance with the accreditation requirement of R 400.121(3). Furthermore, the state's complaint mentions violations of R 400.121(3).

of the accreditation limitation would eliminate the defendants' objection to Rule 104.

The state filed this declaratory judgment action in 1981 in response to defendants' decision to discontinue the license. The plaintiff's complaint and prior enforcement actions sought, inter alia, to enjoin the operation of the preschool until the defendants would supply documentation of the fact that their program directors complied with Rule 104 in conformity with its interpretation of the predecessor regulation, R 400.121(3). The result of granting the state's prayer for declaratory relief would be that the court could immediately order, pursuant to this litigation, that the defendants cease operation of their preschool until such time as they comply with Rule 104.[41]

Therefore, the result of the plaintiff's filing of these proceedings is that defendants face a real and immediate threat of irreparable injury to the constitutional rights they alleged (in their answer to plaintiff's complaint) to be infringed by Rule 104.

2. *Ripeness:* The defendants' claims are ripe for review. The violation of the defendants' allegedly constitutionally protected conduct is an "injury in fact." This "chilling" injury is directly related to a legitimate fear of prosecution. Since the state has not disavowed its intent to enforce the regulations as written, a declaratory judgment on the merits

Given the pattern of agency enforcement of the rule, and the mention of the predecessor rule in the state's complaint seeking to enforce Rule 104 (which contains an explicit accreditation limitation), it is clear that the state sought to enjoin the operation of day-care centers with unaccredited program directors.

[41] After entry of a judgment for declaratory relief, the court can immediately order other relief, such as damages or an injunction, against any adverse party whose rights were determined by declaratory judgment. See, generally, Martin, Dean & Webster, Michigan Court Rules Practice (3d ed), MCR 2.605, p 428, and cases cited therein.

of defendants' claims regarding Rule 104 is appropriate in this context.

MCR 2.605(A)(1) provides that a Michigan court may grant declaratory relief "[i]n a case of actual controversy within its jurisdiction . . . ." An adjudication of the defendants' claims will serve to prevent defendants' actual injuries or losses before they have occurred.[42]

There is ample authority for the proposition that a real and immediate threat to protected constitutional rights can give rise to standing under Article III of the United States Constitution. The defendants need not first expose themselves to an actual prosecution under the challenged provision so long as their fear of prosecution is not imaginary or wholly speculative,[43] *and* so long as the state agency has not disavowed its intent to

[42] In *Detroit Base Coalition for the Human Rights of the Handicapped v DSS*, 431 Mich 172, 191; 428 NW2d 335 (1988), Justice Boyle, writing for a unanimous court, granted declaratory relief to a plaintiff who challenged the validity of an agency policy because it was not promulgated in conformity with "the notice and public-hearing requirements of §§ 41 and 42 of the [Administrative Procedures Act] . . . . The challenged agency action was the issuance of a directive mandating a new telephone hearing policy to go into effect at a future time. The Court reached the merits of this claim, nevertheless, over the objection that the challenge was speculative and without an adequate factual basis. See *Detroit Base Coalition for the Human Rights of the Handicapped v DSS*, 158 Mich App 613, 621-622; 405 NW2d 136 (1987) (Swallow, J., concurring); the addition of more facts would not have sharpened the issues in a way making the legal issue any more fit for judicial resolution, 431 Mich 191-193. A similar analysis applies here.

[43] Where the statute is challenged by someone to whom it has not yet been applied, but who has declared an intent to engage in the very acts that would trigger enforcement of a statute or constitutional provision—or to forego the exercise of those rights because of that law —the harm to those rights cannot be called speculative or hypothetical. See *Clements v Fashing,* 457 US 957, 962; 102 S Ct 2836; 73 L Ed 2d 508 (1982), and cases cited therein. As the dissent points out, *post,* p 468, n 25 (Boyle, J.), in *Clements* the degree of threatened harm was even more nonspeculative than the harm that defendants allege from the repeated enforcement efforts of the dss. Nevertheless, the reasoning of that decision, and the authority it cites, are supportive of our finding of ripeness here.

invoke the criminal penalty provisions in the statute.[44] Moreover, the factual record is too well developed to have any valid basis for conjecture as to the defendants' "fear of prosecution" arising from the possibility that the plaintiff will deny a license for their failure to comply with Rule 104. By maintaining this action, and by its prior enforcement actions, the plaintiff has provided a "palpable basis" for assuming that the license will be revoked.[45]

The dissent contends that "[t]here is no evidence that if defendants decided to comply with the licensure requirement, that the state would deny them a license on the basis that the program director did not attend an accredited college or university." *Post,* p 472 (BOYLE, J.). This argument misses the mark for purposes of analyzing the ripeness issue. The opportunity for an adjudication of constitutional rights in a judicial forum, as authorized by state and federal declaratory judgment procedures, must remain available where there is " 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment,' " *Ellis v Dyson,* 421 US 426, 433; 95 S Ct 1691; 44 L Ed 2d 274 (1975).[46]

---

[44] *Babbitt v United Farm Workers Nat'l Union,* 442 US 289, 302; 99 S Ct 2301; 60 L Ed 2d 895 (1979), citing *Steffel v Thompson,* 415 US 452, 459; 94 S Ct 1209; 39 L Ed 2d 505 (1974). See also *Doran v Salem Inn, Inc,* 422 US 922, 933; 95 S Ct 2561; 45 L Ed 2d 648 (1975).

The defendants in this case have also "engaged in appeals now arguably prohibited by the statute and allege an intent to continue to do the same." *Babbitt, supra* at 302. Therefore, they cannot be sure whether "criminal sanctions will be visited upon them for pursuing . . . conduct, much of which is allegedly constitutionally protected." *Id.* at 302-303.

[45] Cf. *Babbitt, supra* at 303-304 (discussing access and arbitration provisions).

[46] *Id.,* quoting *Steffel v Thompson,* n 44 *supra* at 460, and *Maryland Casualty Co v Pacific Coal & Oil Co,* 312 US 270, 273; 61 S Ct 510; 85 L Ed 826 (1941); see also Floyd, *The justiciability decisions of the*

The ripeness issue we have addressed is not based upon Article III considerations, but is prudential in nature. The fact that the statute or regulation being challenged has not yet been applied to anyone, or has not been enforced against the person challenging its constitutionality, is not a constitutional obstacle to reaching the merits of the claim.[47] There are simply no ripeness concerns of constitutional magnitude that prevent us from deciding these claims.[48]

Thus, a proper ripeness analysis must balance the need for further factual development, combined with any uncertainty as to whether defendants will actually suffer future injury, with the potential hardship of denying anticipatory relief.[49]

*Burger court,* 60 Notre Dame L R 862, 931-935 (1985), and cases cited therein.

I am aware that the Court in *Ellis* disposed of the case by remand, while expressing reservations regarding whether a live case or controversy still existed, *id.* at 434-435. Yet, the case contains a useful discussion of the principles of ripeness that apply here and cites the relevant authority.

[47] See *Adler v New York City Bd of Ed,* 342 US 485; 72 S Ct 380; 96 L Ed 517 (1952); *Epperson v Arkansas,* 393 US 97; 89 S Ct 266; 21 L Ed 2d 228 (1968); *Civil Service Comm v Nat'l Ass'n of Letter Carriers,* 413 US 548; 93 S Ct 2880; 37 L Ed 2d 796 (1973); *Thornburgh v American College of Obstetricians & Gynecologists,* 476 US 747; 106 S Ct 2169; 90 L Ed 2d 779 (1986). The dissent fails to discuss these cases.

[48] The dissent maintains that there is not a sufficient threat of prosecution to satisfy the requirements of Article III, see, e.g., *post,* pp 467-470, especially n 27 (Boyle, J.). The dissent does not, however, distinguish clearly between the standing and ripeness doctrines and their relation to Article III.

The ripeness doctrine has both a constitutionally mandated and a discretionary component. The basis for ripeness in Article III is closely linked to the doctrine of "standing." Both ripeness and standing, in the Article III sense, address "whether the harm asserted has matured sufficiently to warrant judicial intervention," *Warth v Seldin,* 422 US 490, 499, n 10; 95 S Ct 2197; 45 L Ed 2d 343 (1975). The defendants have Article III standing to raise their constitutional claims regarding the regulations, see *supra* pp 410-411. So, the only ripeness concerns presented here are prudential in nature, and judicial review is not necessarily precluded by Article III.

[49] See *Abbott Laboratories v Gardner,* 387 US 136, 148-149; 87 S Ct 1507; 18 L Ed 2d 681 (1967).

The "prudential rules" of standing and ripeness that might preclude this Court from reaching the merits of defendants' claims need not be invoked here. First, the declaratory judgment procedure has allowed the issues to become sharpened so as to make them fit for judicial resolution, *Warth v Seldin,* 422 US 490, 500-501; 95 S Ct 2197; 45 L Ed 2d 343 (1975). Second, the hardship that would result from not deciding the case is a severe one.

3. *Exhaustion of Remedies:* The defendants are not barred from raising a constitutional challenge to Rule 104 in this judicial forum as the dissenting opinion implies, see *post,* p 470, n 28 (Boyle, J.). A party need not first adjudicate its constitutional claims before the administrative body which has jurisdiction over the matter if such effort would be useless in resolving the constitutional claim. See *Trojan v Taylor Twp,* 352 Mich 636, 638-639; 91 NW2d 9 (1958).[50]

The record demonstrates that the DSS has developed a four-step test as an alternative to Rule 104:

> First, [t]he Department would look to a long list of accrediting agencies, including the American Association of Bible Colleges to see if any of those organizations recognized the college in question. Secondly, . . . the Department would . . . determine whether or not a Michigan state college . . . would recognize any of those credits on a transfer basis . . . . [T]hirdly, the Department would go to the state in question such as South Carolina where Bob Jones University is, and to see whether any colleges in South Carolina would accept those credits on a transfer basis. And, finally, if that didn't pan out there's the exemption provision in

---

[50] See, generally, *Craig v Detroit Police Dep't,* 397 Mich 185, 199-201; 243 NW2d 236 (1976) (Coleman, J., dissenting) (citing authority for the proposition that the Court's reluctance to interfere with administrative procedures is properly overcome where public officials are proceeding under an invalid or unconstitutional law).

Rule 118 which any licensee or applicant can apply for an exemption *as long as the goal of the rule is complied with.* [Emphasis added.]

This exemption procedure is inadequate for several reasons. The DSS has not established the adequacy of this procedure because it produced no evidence to prove that the program directors employed by defendant could transfer all their credits to an accredited institution (i.e., so as to comply with the terms of Rule 104.)[51]

The DSS also has not demonstrated that defendants' religious objection to Rule 104 could be accommodated by the 1980 AACS, R 400.5118 exemption. The Rule 118 exemption is inadequate because it is available only where the "intent" of Rule 104 is satisfied, an ambiguous and undefined criteria.[52]

Finally, upon this record, I conclude that the DSS never formalized the exemption procedure (Rule 118) in a manner that created an adequate alternative to Rule 104.[53] The practice of the DSS in

---

[51] The evidence indicates that program directors with graduate degrees from unaccredited schools can expect to have problems in transferring their degree credits—even if they had no religious objection to such a transfer of credits to a secular institution.

The provost of Bob Jones University, Dr. Phillip D. Smith, testified during deposition that his institution is not accredited because it is religiously opposed to submitting to "membership in one of the six regional associations" which is a requirement of the accreditation process. Since Bob Jones University does not conform to the accreditation rules of the Southern Association of Colleges and Secondary Schools, it has remained unaccredited.

[52] The "accreditation" aspects of Rule 104 are in conflict with defendants' sincerely held religious beliefs, making it unlikely that a Rule 118 exemption would have been granted. Also, a Rule 118 exemption must comply with the "intent" of Rule 104, so it is necessarily an inadequate administrative accommodation of defendants' Free Exercise Clause claim.

[53] There is no evidence suggesting that the DSS sought to communicate the existence of Rule 118 exemption procedures so that it would be known to religiously oriented day-care centers that they might obtain administrative accommodation of their Free Exercise Clause objection to Rule 104.

enforcing Rule 104 was to withhold an exemption to Rule 104 unless an "accredited" school was willing to accept transfer credits from an unaccredited college or university.[54] Given this agency practice, the likelihood that a successful agency settlement of defendants' free exercise claims, even if defendants had sought an exemption from Rule 104, is extremely remote. This Court may decide these claims, and there is a need for settled law to govern the agency's future regulation in this area.[55]

### B. MERITS

For the reasons set forth by Justice Griffin, I believe that "the record clearly establishes that the accreditation limitation [imposed by Rule 400.5104(2)(a) in selecting a program director] places a burden upon defendants' free exercise rights." *Post*, p 444 (Griffin, J.). Strict scrutiny of Rule 104 is justified in this case because the regu-

[54] The Court must look to established agency practice and policy to determine the grounds under which an exemption to Rule 104 might be provided under the procedures set forth in Rule 118.

Mr. Harold Gazan, Director of the Bureau of Regulatory Services of DSS, testified in his deposition that the DSS has a policy or practice of relying solely upon the willingness of state "accredited" colleges to accept transfer credits from unaccredited institutions when it determines compliance with Rule 104. Mr. Gazan also stated that if "a particular applicant [for a child day-care license] had a . . . program director who had 60 semester hours of credit from a college with which we were not familiar . . . we would attempt to see if it was accredited . . . . But *if no other accredited college or association accepts* [*a program director applicant holding a degree from an unaccredited college*], *then we would not* [*accept the credits*]." (Emphasis added.) Mr. Gazan's testimony further indicates that the DSS has no established policy or practice of undertaking its own independent evaluation of the quality of unaccredited educational programs from which program directors have obtained their degrees.

[55] The DSS has evinced a willingness to enforce Rule 104 against at least one other religious day-care center. There are potentially a large number of others among the approximately 460 church-run childcare centers in this state, that might be affected by enforcement of this rule.

lation is a substantial infringement of defendants' religious beliefs, backed by the coercive threat of injunctive and criminal penalties that may be imposed for noncompliance with this condition for licensure.

Also, the enforcement of Rule 104 infringes upon a parental "privacy" right to be free of the kind of state regulation embodied in Rule 104. The United States Supreme Court in *Wisconsin v Yoder, supra,* acknowledged the existence of the "fundamental rights" of parents "to direct the intellectual and religious education of their children, and the rights of their children to receive that direction without unnecessary interference by the state."[56] I agree that the constitutional right implicated in *Yoder* and *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925), is infringed upon here for the same reason that the *Yoder* Court determined that such a right was implicated by the Wisconsin compulsory school law.[57] Indeed, "this parental interest is particularly compelling [when it is] combined with a free exercise claim." *Sheridan Road, supra* at 537.

The effect of Rule 104 is that the members of the defendant church, in their role as parents, cannot direct the education of their children. The dissent (BOYLE, J.) never addresses the fact that Rule 104 will frustrate the defendants' ability to appoint a spiritual minister of their own choosing to oversee the church's biblically commanded evangelical function of which the church preschool is an integral part. Rule 104 is a direct interfer-

---

[56] *Sheridan Road, supra* at 536-540, discussing, inter alia, *Yoder, supra* at 233, and *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925).

[57] The *Yoder* Court read *Pierce* to mean that the state may not unnecessarily interfere with a parent's right to prepare a child for "additional obligations" which (as referred to in *Pierce*) " 'must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship . . . .' " *Sheridan Road,* 426 Mich 539 (RILEY, J., plurality), citing *Yoder,* 406 US 233.

ence with the defendants' right to determine the nature of the moral values, religious beliefs, and educational preparation that their preschool age children shall receive.

Even assuming that the state has a compelling interest in imposing minimum educational standards upon preschool teachers, Rule 104 is not the least restrictive means of accomplishing this state interest. The DSS has an entirely nonintrusive alternative available to it, namely, to determine the sufficiency of a program director's educational credentials by means other than the "accreditation associations." In the absence of contrary evidence, we must assume that the state's interests can be otherwise served in this manner without unnecessary expense or undue cost to the state.[58]

I would hold that the program director accreditation rule, R 400.5104(2)(a), is unconstitutional as applied to defendants.[59] The DSS either must grant defendants an exemption to Rule 104 or undertake an independent evaluation of the credentials of defendants' program director to determine whether his qualifications satisfy the minimum educational criteria set forth in Rule 104.

### IV. THE PROGRAM CONTENT RULE 106

Rule 106 prohibits the operation of any child

---

[58] Mere speculation by the government as to the probable or possible injury to the state from granting a Free Exercise Clause exemption, is not enough to justify infringing upon the free exercise of religion. See Pepper, *Taking the Free Exercise Clause seriously,* 1986 BYU L R 299, 316-323, ns 70-101, 334-335, citing *Jensen v Quaring,* 472 US 478; 105 S Ct 3492; 86 L Ed 2d 383 (1985), *Sherbert v Verner, Yoder,* and *Bowen, supra.*

[59] I express no opinion whatsoever on the question whether the state's legitimate interests extend to the regulation of curriculum and of the educational qualifications of staff at private preschools. The state may, in fact, have no compelling interest in regulating this area of private activity where a burden on the free exercise of religion is the result of such regulation. My holding is limited to the "accreditation" aspect of Rule 104.

day-care center that does not provide "opportuni-
ties for the developmental growth"—including
"[the promotion of a] positive self-concept." We
would hold that this rule is unconstitutional under
the First Amendment of the United States Consti-
tution.

While we do not address the defendants' claim
that the program content rule violates their rights
under the Free Exercise of Religion Clause of the
First Amendment,[60] we would find the rule to be
unconstitutionally vague under each of three vari-
ations of the vagueness doctrine. I disagree with
the dissent (Boyle, J.) insofar as it concludes that
Rule 106 is not unconstitutionally vague in all its
applications.[61] The concurrence (Griffin, J.) would
hold that the program content rule is unconstitu-
tionally vague but does not analyze the rule explic-
itly in terms of the overbreadth doctrine.[62]

---

[60] The defendants claim that the term "positive self-concept" em-
bodies a secular humanist belief structure that stands in conflict with
the teachings of defendant Emmanuel Baptist Church. I decline to
address whether the term "positive self-concept" actually constitutes
the enactment of "secular humanism" or whether that is a religious
belief, since it is unnecessary to reach that issue.

[61] The dissent, *post,* pp 474-477, especially ns 38-40 (Boyle, J.),
limits its discussion of the program content rule to the defendants'
overbreadth challenge to Rule 106. Such a narrow approach is not
justified by First Amendment jurisprudence. I have reached and
decided both the defendants' vagueness and overbreadth claims. Con-
trary to the dissent's statement, *post,* p 476, n 43 (Boyle, J.), the
defendants did raise the issue of the vagueness of Rule 106 in all its
applications. Thus, I have reached and decided both the defendants'
overbreadth and vagueness claims, and join the result of the concur-
rence in finding Rule 106 to be vague in all its applications, *post,* pp
446-449 (Griffin, J.). I do not reach the defendants' claim that Rule
106 violates rights of freedom of religion, see below.

While there is a potential burden imposed by Rule 106 on the free
exercise of defendants' religion, no actual burden can be established
because the dss did not seek any injunctive relief relating specifically
to the program content rules and no violations of these rules were
found to have been committed by defendants.

[62] See *post,* pp 446-449 (Griffin, J.).

### A. JUSTICIABILITY

Defendants' challenge of Rule 106 is ripe for review since the claim was timely raised on the basis of an adequate factual record. The record indicates that the enforcement of Rule 106 has occasioned some efforts by DSS officials to interfere with the teaching of religious doctrine to children by the defendant church. Moreover, because we address the vagueness of the rule on its face, the issue is ripe even though the program content rule was never actually applied to the defendant church.[63]

### B. THE VAGUENESS DOCTRINE: INTRODUCTION

The defendants' challenge of the facial validity of the program content rules can be decided on three analytically distinct "vagueness" grounds. There are three distinct strands of vagueness analysis that this Court recognized in *Woll v Attorney General,* 409 Mich 500, 533; 297 NW2d 578 (1980):

> A statute may be challenged for vagueness on the grounds that it
> [1] is overbroad, impinging on First Amendment freedoms, or
> [2] does not provide fair notice of the conduct proscribed, or
> [3] is so indefinite that it confers unstructured and unlimited discretion on the trier of fact to

---

[63] As stated by the Supreme Court in *Keyishian v Bd of Regents of the State Univ of New York,* 385 US 589, 599; 87 S Ct 675; 17 L Ed 2d 629 (1967), "[i]t is no answer [to an allegation of unconstitutional vagueness] to say that the statute would not be applied in such a case." See also *Int'l Society for Krishna Consciousness v Eaves,* 601 F2d 809, 832 (CA 5, 1979) (the facial invalidation of excessively broad grants of discretion indicates that the vagueness problem in some statutes is not potential abuse but the very existence of broad censorial power).

determine whether an offense has been commit-ted.[64]

We begin with the second ground.

### C. RULE 106 DOES NOT PROVIDE FAIR NOTICE

If the term "positive self-concept" has no core meaning to be reasonably understood, or that can be commonly accepted as valid, the statute is vague on its face. See *Blackwelder v Safnauer,* 689 F Supp 106, 126 (ND NY, 1988), a state law will be found to be unconstitutionally vague on its face only when its requirements are " 'expressed in terms of such generality that "no standard of conduct is specified at all." ' " *Coates v Cincinnati,* 402 US 611, 614; 91 S Ct 1686; 29 L Ed 2d 214 (1971). See also *Village of Hoffman Estates v The Flipside, Hoffman Estates, Inc,* 455 US 489; 102 S Ct 1186; 71 L Ed 2d 362 (1982).

The plaintiff's experts testified that the term "positive self-concept" has no fixed definition. Dr. Ruopp stated that the term "positive self-concept" is incapable of any precise or objective definition:

> Positive self-concept I think is the—can be defined broadly enough so that it can be used by anybody of any particular persuasion to define what they are doing with the children. I don't think anybody will say that they want to give the children negative self-concept.[65]

---

[64] See also *People v Howell,* 396 Mich 16, 20; 238 NW2d 148 (1976); *People v Petrella,* 424 Mich 221, 253; 380 NW2d 11 (1985); *People v Hayes,* 421 Mich 271, 283; 364 NW2d 635 (1984).

[65] Dr. Ruopp described the term as a "sign post rather than as a prescription," encompassing such vastly different world views as "secular humanism" and "the most rigorous kind of religious training." He did add that "a trained observer like myself would recognize those [criteria, such as intellectual development, physical development, social development, emotional development, and spiritual development,] as being appropriate program elements," but, he concluded

The testimony of another state expert on child development, Dr. Elliott, confirms Dr. Ruopp's view that the term "positive self-concept" can be defined in a potentially limitless number of ways. Dr. Elliott acknowledged that any definition of the term "positive self-concept" necessarily reflects the "different philosophical bases" of the opinions held by anyone venturing to define "positive self-concept."[66]

Thus, Rule 106 requires all child day-care centers to adopt curriculum and programs that promote a feeling in children which cannot be accurately defined. This rule is void on its face because persons "of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v General Construction Co,* 269 US 385, 391; 46 S Ct 126; 70 L Ed 322 (1926). Moreover, the indeterminate nature of the rule is inherent in its operative language. Since the term "positive self-concept" suffers from the same species of vagueness that was also inherent in the term "mental anguish" (as defined by the Court of Appeals) in *People v Petrella,* 424 Mich 221, 263; 380 NW2d 11 (1985), citing 124 Mich App 745, 763; 336 NW2d 761 (1983), more exact language must be employed.[67] There is also no ordinary or generally understood meaning that can be derived from this term—though there was in *Pe-*

that the measurement of any of these objective indicators of "how children feel about themselves, in whatever value the [child day-care] center has" is entirely "dependent on how you interpret positive self-concept."

[66] Even though Dr. Elliott stated that any person trained in early childhood education would understand what the term encompasses, she could provide no more precise definition of the concept than to say that it includes "some good feelings about yourself."

[67] Just as there is no type of "mental anguish" that is the normal response to being raped, see *Petrella, supra,* 424 Mich 267, there is also no particular state of mind which the term "positive self-concept" describes.

*trella, supra* at 257—and so, there is no alternative but to strike down the rule containing this language on the grounds of vagueness.

### D. OVERBREADTH OF PROGRAM CONTENT RULE 106

I also find that Rule 106 is unconstitutionally "overbroad, impinging on First Amendment freedoms." *Woll, supra,* 409 Mich 533. The overbreadth doctrine provides an independent, and wholly distinct, ground for deciding that Rule 106 is unconstitutionally vague.[68] Under *Broadrick v Oklahoma,* 413 US 601, 615; 93 S Ct 2908; 37 L Ed 2d 830 (1973),

> [the overbreadth] must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

Rule 106 may be struck down if it too severely "chills" a day-care operator's right to teach abstract ideas that do not pose any "harm" to children which the state may regulate.

Because the term "positive self-concept" does not "communicate its reach in words of common understanding," *Boos v Barry,* 485 US 312, 332; 108 S Ct 1157; 99 L Ed 2d 333 (1988), the rule will have a chilling effect on the rights of free expression enjoyed by defendant church members.[69] The rule fails to establish "minimal guidelines" to govern its enforcement and, thereby, permits the punishment of constitutionally protected free speech activities. See *Kolender v Lawson,* 461 US 352, 358; 103 S Ct 1855; 75 L Ed 2d 903 (1983)

---

[68] For a summary of the relevant legal standard, see *Blackwelder, supra,* 689 F Supp 126, n 19, and cases cited therein.

[69] I also note the chilling effect is not cured by the DSS' duty to specify reasons for the denial of a license prior to its revocation, nor the availability of judicial review of any licensing revocation.

(O'Connor, J., majority). See, generally, Tribe, American Constitutional Law (2d ed), § 12-32, p 1034, n 11. Because the curriculum content rule is clearly a content-based restriction on speech under the reasoning in *Boos, supra,* this Court must apply a very exacting degree of judicial scrutiny.

Indeed, the United States Supreme Court has struck down nearly every content-based restriction on speech, outside the realm of low-value speech, that it has considered in the past thirty years.[70]

I find that the state has not shown a compelling interest sufficient to justify infringing upon the potentially broad range of constitutionally protected speech that Rule 106 may be interpreted to prohibit.

I decline to provide a saving construction of the program content rule by striking the term "positive self-concept" from the regulations to cure the dangers of overbreadth since there is no limiting construction that can be made to cure the constitutional defect. *Bd of Airport Comm'rs of Los Angeles v Jews for Jesus,* 482 US 569; 107 S Ct 2568; 96 L Ed 2d 500 (1987). Moreover, were we to attempt to cure the overbreadth problem by defining the limits of the permissible reach of state regulation of the curriculum of private day-care centers, we might risk delving illegitimately into the legislative domain.

### E. RULE 106 CONFERS UNSTRUCTURED AND UNLIMITED DISCRETION ON DSS OFFICIALS

Finally, Rule 106 also delegates too much discretion to agency administrators to withdraw licensure from childcare centers because of problems in preschool curriculum content. Rule 106 fails to

---

[70] See Stone, *Content-neutral restrictions,* 54 U Chi L R 46, 47-48 (1987), and cases cited therein.

provide any minimal guidelines to notify child day-care center operators of the type of conduct that will run afoul of the rule and, therefore, subjects the exercise of free speech rights "to an unascertainable standard." *Ellis v O'Hara,* 612 F Supp 379, 381 (ED Mo, 1985), citing *Coates v Cincinnati, supra* at 614. See also *Niemotko v Maryland,* 340 US 268, 271; 71 S Ct 325; 95 L Ed 267 (1951) (reversing a disorderly conduct conviction of a Jehovah's Witness).

The broad discretion that Rule 106 confers on the DSS, unconstrained by any clear standard, is accompanied by an implicit mandate to the agency to carefully scrutinize and evaluate the curriculum of day-care centers. Indeed, the rule would be unenforceable if the DSS did not inject itself into the curriculum of child day-care centers to some degree.

Justice Brennan described the dangers of this type of unlimited discretion in *Lakewood v Plain Dealer Publishing Co,* 486 US 750; 108 S Ct 2138; 100 L Ed 2d 771 (1988). The government may not regulate expressive activity pursuant to narrowly drawn content-neutral standards "when the only standard provided is the unbridled discretion of a municipal official"—even if some more limited delegation of regulatory authority would be permissible under the constitution. *Id.* at 764, n 9. Moreover, the licensing scheme at issue here "pose[s] a real and substantial threat of the identified censorship risks." *Id.* at 759. Thus, Rule 106 is unconstitutionally vague in a third sense.

### V. FINANCIAL DISCLOSURE

The defendants have raised the further claim that the statutory provisions relating to the finances of child day-care center license applicants,

MCL 722.112; MSA 25.358(12), violate "sensitive First Amendment rights." The evidence indicates that the defendants at one time were required by the DSS to disclose financial information pursuant to these provisions. The requirement for license applicants to submit a financial statement was discontinued by a policy memorandum issued in 1974.

### A. JUSTICIABILITY

The defendants' claims regarding the financial disclosure provisions were timely raised below and are justiciable now. Where a party voluntarily ceases an activity challenged as illegal, a court may continue to exercise jurisdiction over the controversy, so long as " 'there is [any] reasonable expectation that the wrong will be repeated.' " *United States v W T Grant Co,* 345 US 629, 633; 73 S Ct 894; 97 L Ed 1303 (1953). This exception to the mootness doctrine has been applied to address a challenge to an administrative regulation even though the regulation was withdrawn during the pendency of litigation challenging its legality, *Los Angeles v Lyons,* 461 US 95, 101; 103 S Ct 1660; 75 L Ed 2d 675 (1983), and to a city ordinance challenged on vagueness grounds that was also repealed during the litigation.[71]

I disagree with the dissent which argues that the defendants' claims are moot, see *post,* p 474 (Boyle, J.). The instant claim is not moot; rather, the issue presented here remains ripe because " 'mere voluntary cessation of allegedly illegal conduct does not moot a case,' " *Deakins v Monaghan,* 484 US 193, 201, n 4; 108 S Ct 523; 98 L Ed 2d 529 (1988), and cases cited therein.

---

[71] *City of Mesquite v Aladdin's Castle, Inc,* 455 US 283, 289; 102 S Ct 1070; 71 L Ed 2d 152 (1982). See also Tribe, *supra,* § 3-11, p 89, n 50.

## B. FREEDOM OF RELIGION CLAIMS

The defendants' claims are unripe. I agree with the Court of Appeals that there is a lack of evidence in the record to show an actual infringement upon the free exercise of defendants' religion resulting from the enforcement of this statutory provision in 1974. If the DSS undertakes a complete inspection of the financial records of churches who run childcare centers, there is some risk of an entanglement between church and state. I also recognize that there is some authority for the proposition that a statute allowing the state to gather financial information from a church may violate First Amendment religious freedoms absent any showing at all that the church has already suffered actual burdens. *Surinach v Pesquera de Busquets,* 604 F2d 73, 75-77 (CA 1, 1979).[72]

I decline, however, to decide if the statutory financial disclosure provisions violate defendants' First Amendment freedoms of religion on this limited factual record. First of all, defendants have not offered evidence or even claimed that completing a single financial form when applying for a childcare center license burdens their ability to practice their religion freely. Second, the record does not show any significant "regulatory entan-

---

[72] The Court in *Surinach* construed the financial-disclosure regulations implemented by the Puerto Rico Department of Consumer Affairs to investigate possible inflationary trends in the cost of private school education. The United States Court of Appeals for the First Circuit held that the burden is on the state "to show that implementation of a regulatory scheme will not ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance." 604 F2d 75-76.

To raise a First Amendment claim, the effect of a disclosure requirement must at least be to create "a palpable threat of state interference with the internal policies and beliefs of these church related schools." *Id.* at 76-77, citing *Serbian Eastern Orthodox Diocese for the United States of America and Canada v Milivojevich,* 426 US 696, 713; 96 S Ct 2372; 49 L Ed 2d 151 (1976).

glement" that has resulted from the minimal financial disclosure which has taken place. See *Walz v Tax Comm of New York City,* 397 US 664, 674; 90 S Ct 1409; 25 L Ed 2d 697 (1970). The unique circumstances justifying the opposite conclusion in *Surinach* and *NLRB v Catholic Bishop of Chicago,* 440 US 490; 99 S Ct 1313; 59 L Ed 2d 533 (1979), are not present here.[73]

If the DSS should rely on its statutory authority to require childcare organizations to prove they are financially stable[74] and compel extensive disclosure of financial information, such requirements may interfere too greatly with the defendants' freedom of religion and for that reason be unconstitutional *as applied.*

### C. FREEDOM OF ASSOCIATION CLAIMS

I do not reach or decide defendants' freedom of association claims because it is impossible to discern the breadth of financial information that the DSS will actually require to be disclosed. The defendants' claim, which relates to the mere existence of the statutory authority relating to financial disclosure, is unripe.

---

[73] Justice GRIFFIN relies on both cases to conclude defendant is exempt from the financial disclosure conditions, see *post* at 450.

In *Surinach,* the interests of the defendant and the interests of the agency and the church with respect to how much ought to be spent were opposed and potentially irreconcilable, whereas here the DSS and defendants have congruent interests (i.e., both parties wish to provide facilities that are minimally adequate for the care of children).

In *Catholic Bishop, supra* at 504, the state application of the labor laws to the "church-teacher relationship in a church-operated school" was viewed by the Court in no uncertain terms: "We see no escape from conflicts flowing from the board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow."

[74] The DSS has authority to promulgate rules relating to financial ability pursuant to MCL 722.112(3)(c); MSA 25.358(12)(3)(c) and to make compliance with them a condition of licensure. MCL 722.115(1); MSA 25.358(15)(1).

The defendants claim that these statutory provisions compel financial disclosure in violation of the First Amendment by infringing upon associational freedoms. The First and Fourteenth Amendments protect the church members' "freedom to engage in association for the advancement of beliefs and ideas," and disclosure of the identities of a group's members or contributors may have the practical effect of discouraging the exercise of these constitutionally protected rights. *NAACP v Alabama ex rel Patterson,* 357 US 449, 460; 78 S Ct 1163; 2 L Ed 2d 1488 (1958).

The statutory provisions at issue give the DSS the authority to compel disclosure of a broad range of information relating to the defendants' "general financial ability." This information is intended to show the DSS that operators have a capability of adequately funding their childcare center.

If we were to decide the merits, this statute would be subjected to strict judicial scrutiny.[75] Strict scrutiny would apply even in the absence of

---

[75] The United States Court of Appeals for the Second Circuit, in *Local 1814, Int'l Longshoremen's Ass'n v Waterfront Comm of New York Harbor,* 667 F2d 267, 270-271 (CA 2, 1981), has summarized the relevant authority for applying strict scrutiny here:

[G]overnmental attempts to compel such disclosures have been subjected to exacting scrutiny. *Buckley v Valeo,* 424 US [1, 64-74; 96 S Ct 612; 46 L Ed 2d 659 (1976)]; *Gibson v Florida Legislative Investigation Committee,* 372 US 539; 83 S Ct 889; 9 L Ed 2d 929 (1963); *Shelton v Tucker,* 364 US 479; 81 S Ct 247; 5 L Ed 2d 231 (1960); *Bates v City of Little Rock* [361 US 516; 80 S Ct 412; 4 L Ed 2d 480 (1960)]; *NAACP v Alabama, supra; Pollard v Roberts* [283 F Supp 248 (ED Ark, 1968) (three judge court), aff'd per curiam 393 US 14; 89 S Ct 47; 21 L Ed 2d 14 (1968)]; cf. *Talley v California,* 362 US 60; 80 S Ct 536; 4 L Ed 2d 559 (1960) (disclosure of identities of anonymous pamphleteers). Compelled disclosure is not permitted unless it is substantially related to a compelling governmental interest. *Buckley v Valeo, supra,* 424 US at 64; 96 S Ct at 656; *Communist Party of the United States v Subversive Activities Control Board,* 367 US 1, 92-103; 81 S Ct 1357, 1408-1414; 6 L Ed 2d 625 (1961).

a factual record of past harassment.[76] If the DSS at
some future date compels a broad range of finan-
cial information, including the identity of donors
to the defendant church, this could exert a "chill-
ing" effect on the associational rights that the
church may assert on behalf of its members. See
*Shelton v Tucker,* 364 US 479; 81 S Ct 247; 5 L Ed
2d 231 (1960).[77]

The control which DSS exerts over the defendant
church by periodic licensing of its childcare "min-
istry" is no less pervasive than the control the
Arkansas School Board exercised over the public
school teacher in *Shelton.* Also, like the disclosure
requirement in *Shelton,* the childcare organization
act "does not provide that the information it re-
quires be kept confidential." *Shelton, supra* at 486.
Thus, if the members' contributions were required
to be disclosed, the church might legitimately fear
that the identity of its contributors "might dis-
please those who control [its] . . . destiny [i.e., DSS
officials]," which "would simply operate to widen
and aggravate the impairment of constitutional
liberty." *Id.* at 486-487. I leave this issue to be
decided later upon an adequate record.

### VI. THE CORPORAL PUNISHMENT RULE

I agree with a unanimous Court that Rule 107
does not violate the Free Exercise Clause of the
First Amendment. The rule clearly serves a com-
pelling state interest in guaranteeing the health
and safety of children at day-care facilities. No
alternative regulation exists that would burden
the defendants' religious belief to a lesser extent.

---

[76] *Local 1814, Int'l Longshoremen's Ass'n,* n 75 *supra,* 667 F2d 271-
272.

[77] In *Shelton,* the plaintiff's annual teaching contract was not
renewed because he failed to file an affidavit "listing all of his
organizational connections over the previous five years." *Id.* at 483.

GRIFFIN, J. (*concurring in part and dissenting in part*). We would hold that the Free Exercise Clause of the First Amendment of the Constitution of the United States, as applied to the states through the Fourteenth Amendment, precludes the state from compelling the Emmanuel Baptist Preschool, a ministry of the Emmanuel Baptist Bible Church, to be licensed under the childcare organization act. We would also hold that defendants are exempt by virtue of the Free Exercise Clause from those provisions of the act which give the DSS authority to inspect defendants' finances in connection with the operation of their pervasively religious preschool/day-care program. With respect to the other issues raised in this appeal, we concur in the results reached by the Court, i.e., that DSS administrative rules relating to director qualifications and program content may not be enforced as against these defendants, and that the administrative rule relating to corporal punishment is constitutional.

I

The four basic elements of the Free Exercise Clause standard of review applicable in this case are accurately described by Justice CAVANAGH in the lead opinion. We agree with him that strict scrutiny is required, that "[*Wisconsin v*] *Yoder* [406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972)] remains good law, and must be applied here in the manner as described in *Sheridan Road* [*Baptist Church v Dep't of Ed,* 426 Mich 462, 574-578; 396 NW2d 373 (1986)] (RILEY, J.)." (*Ante,* p 398 CAV-ANAGH, J.)[1]

_____

[1] Recently the United States Supreme Court reiterated that

"[a] regulation neutral on its face may, in its application,

The principal free exercise claim advanced by defendants focuses on the licensure requirement contained in the childcare organization act, which states in part:

> A person, partnership, firm, corporation, association or nongovernmental organization shall not establish or maintain a childcare organization unless licensed or registered by the department. . . . Before issuing or renewing a license, the department shall investigate the activities and proposed standards of care of the applicant and shall make an on-site visit of the proposed or established organization. If the department is satisfied as to the need for a childcare organization, its financial stability, the good moral character of the applicant, and that the services and facilities are conducive to the welfare of the children, the license shall be issued or renewed. [MCL 722.115(1); MSA 25.358(15)(1).]

nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Wisconsin v Yoder,* 406 US 205, 220 (1972). Our cases have established that "[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v Commissioner,* 490 US — [109 S Ct 2136; 104 L Ed 2d 766] (1989) (citations omitted). [*Jimmy Swaggart Ministries v California Bd of Equalization,* 493 US —, —; 110 S Ct 688; 107 L Ed 2d 796, 806 (1990).]

We concur with Justice Cavanagh's reasoning that the so-called "objective" analysis of burdens proposed by the dissent is not warranted by either existing precedent or the present circumstances. We share his views regarding the reach and meaning of *Lyng v Northwest Indian Cemetery Protective Ass'n,* 485 US 439; 108 S Ct 1319; 99 L Ed 2d 534 (1988). *Ante,* pp 393-400. Nevertheless, it cannot be denied that differences concerning the meaning of *Lyng,* have developed in the federal courts of appeal. For example, cf. *United States v Means,* 858 F2d 404 (CA 8, 1988), cert den 492 US —; 109 S Ct 3227; 106 L Ed 2d 575 (1989), *Yonkers Racing Corp v City of Yonkers,* 858 F2d 855 (CA 2, 1988), cert den 489 US 1077; 109 S Ct 1527; 103 L Ed 2d 833 (1989), and *Messiah Baptist Church v Jefferson Co,* 859 F2d 820 (CA 10, 1988), cert den 490 US 1005; 109 S Ct 1638; 104 L Ed 2d 154 (1989).

The act provides for criminal sanctions. A violation of its requirements is punishable as a misdemeanor by the imposition of a fine of no more than $1,000, or imprisonment for not more than 90 days, or both. MCL 722.125; MSA 25.358(25).

The DSS has not directly disputed defendants' claim that their objection to licensing is grounded in sincerely held religious belief. Ample evidence was introduced at trial to show that the Emmanuel Baptist Preschool program is part of the church's ministry, and that the program is pervasively religious and was established by the church to impart its religious doctrine to the children of its members and to others who might attend. Witnesses for defendants testified that the preschool was established in response to a Biblical command, that the concept of "calling" is basic to fundamentalist ministries, and that this ministry —the preschool program—is "mandated" by the Lord. As the trial court found, and explained:

> The evidence establishes that the child care program operated by Defendant Church is an integral part of the total educational ministry of the church. Defendant Church belongs to the fundamentalist Christian movement which believes that the operation of a school, including a preschool, is an extension of the Christian home and of the church. All aspects of the preschool program are permeated with religious doctrine. The children are taught to understand the philosophy of the scriptures about obedience to parents and those in authority.
>
> \* \* \*
>
> It is determined that Defendant Church's activity in operating the day care center is religiously grounded and, as such, it is protected by the free exercise clause of the First Amendment.

Concluding that the trial court was justified in

finding that the church's preschool/day-care program is rooted in its fundamentalist Baptist doctrine,[2] we turn to consider whether the act's licensure requirement burdens the free exercise by defendants of their religious beliefs.

A license has been defined as "the permission by competent authority to do an act which, without such permission, would be illegal." *People v Henderson,* 391 Mich 612, 616; 218 NW2d 2 (1974). In this case, the church contends that "submitting to licensing places the state in sovereignty over the Lord in violation of its religious belief." The church maintains that its preschool/day-care program was established in response to a Biblical command "to teach the precepts of the word of God to our children." Dr. Rushdoony, an expert witness called by the church, described the religious nature of the church's claim against licensing:

> [T]he concept that the State has the right to govern what belongs to Christ is religiously offensive.
>
> * * *
>
> They see their right to operate a ministry as indeed a mandate from Jesus Christ who is Lord, who is sovereign, and therefore in that sense, it is absolute. . . . They are ready to recognize that there are legitimate health and fire requirements, but they do not see that beyond that . . . that there is any jurisdiction of the State.

---

[2] In *Wisconsin v Yoder, supra,* traditional work was accepted as part of the religious activity of the Amish. The Court noted that the State of Wisconsin did not contest "the claim that the Amish mode of life and education is inseparable of their religion—indeed, as much a part of their religious belief and practices as baptism, the confessional, or a sabbath may be for others." See also *State v Heart Ministries, Inc,* 227 Kan 244, 253-254; 607 P2d 1102 (1980); *New Jersey State Bd of Higher Ed v Bd of Directors of Shelton College,* 90 NJ 470, 481-483; 448 A2d 988 (1982); *Roloff Evangelistic Enterprises, Inc v State,* 556 SW2d 856 (Tex Civ App, 1977), app dis 439 US 803 (1978), reh den 439 US 998 (1978).

As viewed by the church's pastor, Rev. Harold Asire, "the function of a license or the power to license is the power to withdraw the license. And the power to withdraw the license is the power to control whether or not we would have pre-school or not."[3]

Licensing, by its very nature, is a prior restraint. *Cantwell v Connecticut,* 310 US 296; 60 S Ct 900; 84 L Ed 1213 (1940); cf. *Murdock v Pennsylvania,* 319 US 105; 63 S Ct 870; 87 L Ed 1292 (1943), and *Follett v McCormick,* 321 US 573; 64 S Ct 717; 88 L Ed 938 (1944) (flat license taxes operated as a prior restraint on the exercise of religious liberty). "Whenever a prior restraint impinges upon First Amendment rights, it carries a heavy presumption against constitutional validity." *Int'l Society for Krishna Consciousness, Inc v Rochford,* 585 F2d 263, 271 (CA 7, 1978). In *Cantwell, supra,* the Supreme Court struck down an ordinance which required a Jehovah's Witness to obtain a license before soliciting funds for religion purposes. The Court said,

> [T]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution. [310 US 307.]

The act's requirement that defendants obtain a license from the DSS before they may conduct their preschool/day-care program "affirmatively com-

---

[3] Several courts have concluded that a church's exercise of religious beliefs is not burdened by such a licensing requirement, e.g. see *Roloff Evangelistic Enterprises v State,* n 2 *supra,* p 859; *State v Fayetteville Street Christian School,* 42 NC App 665; 258 SE2d 459 (1979); vacated on different issue 299 NC 351; 261 SE2d 908 (1980), *On Rehearing* 299 NC 731; 265 SE2d 387 (1980), app dis 449 US 807 (1980).

pel[s] [defendants], by threat of sanctions, to re-
frain from religiously motivated conduct or to
engage in conduct that they find objectionable for
religious reasons." *Bowen v Roy,* 476 US 693, 703;
106 S Ct 2147; 90 L Ed 2d 735 (1986); see also
*Sheridan Road, supra,* p 554 (RILEY, J.). From the
perspective of these particular defendants, the
act's licensing provision requires submission to the
authority of the state to decide whether this reli-
gious activity may be conducted.[4] We conclude, as
did the trial court, that the evidence adduced in
this case demonstrates that defendants' practice of
their religion is burdened by the act's licensing
requirement. Accordingly, we turn now to consider
whether such a burden is nevertheless outweighed
by a compelling state interest which justifies de-
nial of an exemption in this case.

The DSS contends that the state has a "compel-
ling interest in the health, safety and welfare of
children in day-care facilities." That the state has
a fundamental interest in protecting its citizens,
especially the young, is not contested. See *Barsky
v Bd of Regents of SUNY,* 347 US 442, 449; 74 S
Ct 650; 98 L Ed 829 (1954); *Prince v Massachu-
setts,* 321 US 158, 168-169; 64 S Ct 438; 88 L Ed
645 (1944).

DSS witnesses emphasized at trial that pre-
schools and day-care centers may present hazards
to children's safety in the form of insufficient staff,
improper nutrition, dangerous toys, the reception
of sick children, and the specter of "child abuse,

---

[4] The act provides that a license shall be issued only if the DSS is
"satisfied as to the *need*" for a childcare organization. MCL
722.115(1); MSA 25.358(15)(1).

Mr. Gazan, witness for the DSS, testified at trial that the depart-
ment had no criteria by which it evaluated "need." See *Cantwell,
supra* at 305, where in considering a free exercise of religion claim,
the United States Supreme Court struck down a licensing require-
ment after focusing on the discretionary power left to a government
official to grant or withhold the license.

including excessively severe disciplinary practices." Although that is true, the United States Supreme Court, nevertheless, "has consistently asked the Government to demonstrate that unbending application of its regulation to the religious objector 'is essential to accomplish an overriding governmental interest.'" *Bowen v Roy, supra,* 476 US 728 (O'Connor, J., concurring in part and dissenting in part). The state does not meet its burden merely by showing a compelling interest in the general subject matter of its regulation. To override claims of religious exemption, the state must demonstrate a compelling need to apply the law in the particular case at bar:

> [D]espite its admitted validity in the generality of cases, we must searchingly examine the interest that the State seeks to promote . . . *and the impediment to those objectives that would flow from recognizing the claimed . . . exemption.* [*Yoder, supra,* 406 US 221. Emphasis supplied.]

Otherwise stated,

> In applying the least restrictive alternative-compelling interest requirement, it is crucial to avoid the error of equating the state's interest in denying a religious exemption with the state's usually much greater interest in maintaining the underlying rule or program for unexceptional cases. Only the first interest—that in denying an exemption—is constitutionally relevant when an exemption is sought. [Tribe, American Constitutional Law (1st ed), p 855.][5]

In the instant case defendants concede that the

---

[5] In a later edition of his treatise, Professor Tribe suggests that post-*Yoder* decisions have reduced the burden of persuasion imposed upon the state. Tribe, American Constitutional Law (2d ed), pp 1260 ff.

state's interest in protecting the health and safety of young children is of the highest order. Defendants do not object to regulations that directly relate to health, fire, sanitation, and other safety requirements; indeed, the church's preschool would submit to licensing of its facilities for safety reasons. However, defendants reject the proposition that the state has constitutional authority to license the ministry activity itself.[6] For the DSS to argue, as it does, that it has a compelling interest in the broader purpose of "licensing and regulating day-care facilities" or "providing young children with quality preschool programs," (see the Court of Appeals opinion, 150 Mich App 264, 267) is to beg the question in this case. As against defendants' fundamental right of religious freedom, such a contention on the part of the DSS falls short of identifying a recognized compelling state interest for purposes of First Amendment jurisprudence.

As in *Wisconsin v Yoder, supra,* the instant case

> involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children. The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. If not the first, perhaps the most significant statements of the Court in this area are found in *Pierce v Society of*

---

[6] The state questions the doctrinal consistency of accepting state authority to license in the fire and safety areas, but rejecting the authority of the state to license the activity which is the ministry itself. But "[defendant] drew a line, and it is not for [the court] to say that the line [it] drew was an unreasonable one. Courts should not undertake to dissect religious beliefs . . . ." *Thomas v Review Bd Ind Employment Security Div,* 450 US 707, 715; 101 S Ct 1425; 67 L Ed 2d 624 (1981).

*Sisters* [268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925)], in which the Court observed:

*          *          *

"The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 US at 534-535.

The duty to prepare the child for "additional obligations," referred to by the Court, must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship. *Pierce,* of course, recognized that where nothing more than the general interest of the parent in the nurture and education of his children is involved, it is beyond dispute that the State acts "reasonably" and constitutionally in requiring education to age 16 in some public or private school meeting the standards prescribed by the State.

However read, the Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children. [*Yoder, supra,* 406 US 232-233.][7]

There is even more reason here than in *Yoder* to accommodate the defendants' free exercise claims. In this case, the state's interest is of a decidedly different nature than the interest in compulsory education involved in *Yoder* and *Sheridan Road, supra.* Where a government undertakes to require parents to see that their children receive a certain level of education, regulation of the quality and content of the educational program may be necessary. See *Sheridan Road, supra,* pp 478-480. How-

---

[7] In *Yoder,* the Court exempted members of the Amish faith from the state's requirement of compulsory secondary school attendance until age sixteen.

ever, the state has never asserted an interest in requiring all children to be exposed to a state regulated preschool/day-care program in order to enhance their social, physical, intellectual or emotional development. Rather, as explained by the DSS' own expert, Mr. Class, the state's interest in regulating preschool/day-care programs is preventive. He pointed to the regulation of public health as an analogy to the underlying purpose of licensing childcare centers. When such a broad prophylactic purpose has the effect of regulating protected activity in advance, it becomes suspect. *NAACP v Button,* 371 US 415, 438; 83 S Ct 328; 9 L Ed 2d 405 (1963).

> To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens. [*Yoder, supra,* 406 US 233-234.]

But in this case, nothing in the record indicates that exempting these particular defendants from the licensing requirement would pose a "grave and immediate" danger to the state's interest in protecting the welfare of the children involved. *West Virginia Bd of Ed v Barnette,* 319 US 624, 639; 63 S Ct 1178; 87 L Ed 1628 (1943). This is not a case in which harm to the health or safety of those children attending defendants' preschool/day-care program has been demonstrated or even implied. As noted above, defendants are more than willing to submit to health and safety requirements and have done so in the past.[8]

---

[8] Moreover, the state's witness, Mr. Gazan, testified that seventy-five to eighty percent of the license applicants are in fact issued licenses. He stated that the remainder of the applicants withdraw their applications of their own accord. In other words, no significant

Absent any evidence that it would interfere with the state's interest in protecting the health, safety, and welfare of preschool children, a religious exemption from licensing is warranted under the particular circumstances of this case.

This conclusion is buttressed by the fact that less burdensome alternative means are available by which the DSS could fulfill its stated interest. Although not required to do so under the strict scrutiny standard, defendants have convincingly pointed out that the state could accomplish its legitimate objective through a program of registration, such as that allowed for family day-care homes where six or fewer children are cared for at a time. MCL 722.111(f)(iii), (l), (m) and (n); MSA 25.358(11)(f)(iii), (l), (m) and (n). Defendants recognize that application of the act's more limited requirement of registration, rather than licensure, would still subject their preschool program to some state control. For example, the state could make periodic inspections and enforce standards relating to the safety, health, and welfare of the children. See MCL 722.111(l), (m); MSA 25.358(11) (l), (m), MCL 722.115; MSA 25.358(15). However, as defendants see it, the less obtrusive procedure of registration would accommodate defendants' fundamental religious objection to the concept that the state, through its power to grant or withhold a license, is to decide whether the pervasively religious activity of this ministry is to be conducted.[9]

---

prescreening occurs which would indicate that the licensing scheme is essential to the state's ability to weed out unfit day-care centers and protect the health and welfare of children. However, such a rational basis analysis is not a sufficient standard in this free exercise case. See *Sherbert v Verner*, 374 US 398, 406; 83 S Ct 1790; 10 L Ed 2d 965 (1963), and *Yoder, supra*, p 215.

[9] We find it instructive that the concept of licensing or the exercise by government of approval power over religious schools has been struck down by courts in several other states. For example, see *Kentucky State Bd for Elementary & Secondary Ed v Rudasill*, 589

It is noteworthy that under the existing statutory scheme a childcare center which is operated by the state or by a local unit of government within this state need not be licensed, but only

> evaluated and approved at least once every 2 years, using this act and rules promulgated thereunder for similar nongovernmental organizations licensed under this act. A report of the evaluation shall be furnished to the funding body for each child care organization. Unless child care organizations are approved, or provisionally approved, as meeting the appropriate administrative rules, state funds shall not be appropriated for their continued operation. [MCL 722.116; MSA 25.358(16).]

As the Court of Appeals discussed in *Erickson v Dep't of Social Services,* 108 Mich App 473, 479; 310 NW2d 428 (1981):

> Although a state or local government run facility is subject to the same rules of operation as its private counterpart, including criminal penalties for failure to comply with such standards, MCL

SW2d 877 (Ky, 1979), cert den 446 US 938 (1980) (a state regulatory scheme imposed on private religious schools was found to be violative of the state's constitution); *State v Whisner,* 47 Ohio St 2d 181; 351 NE2d 750 (1976) (state imposition of "minimum standards" on private church schools was held to be unconstitutional as violative of both the Free Exercise Clause and the Due Process Clause of the Fourteenth Amendment); *State v LaBarge,* 134 Vt 276; 357 A2d 121 (1976) (parents were held not to be subject to truancy violations for sending their children to a private Christian school which was not "approved"); *Forest Hills Early Learning Center, Inc v Grace Baptist Church,* 846 F2d 260 (CA 4, 1988) (a state's statutory exemption of church operated childcare centers from licensing regulations was held not to offend the Establishment Clause of the First Amendment).

Moreover, evidence introduced at trial included reference to statutes of other states which have accommodated religious organizations with respect to licensing childcare facilities. See, e.g., Ala Code, § 38-7-3; Ill Pub Act 82-982; Ind Code Ann, § 12-3-2-12.7; La Rev Stat Ann, § 46.1404; Miss Code Ann, § 43-14-9; Mo Rev Stat, § 210.516(5); NC Gen Stat, § 131D-10.4(1); SC Code, §§ 20-7-2700, 2900-2990; Va Code, § 63.1-196.3.

722.125; MSA 25.358(25), the state's formal approval of the facility does not constitute a similar prerequisite to operation. In fact, the language of MCL 722.116; MSA 25.358(16) discloses that the state's only recourse against unapproved government run facilities, which are not otherwise subject to the criminal penalties noted above, is to withhold state funds.

That a different scheme of regulation exists for state and local government-operated facilities serves to demonstrate that the DSS could be more flexible in the instant case.[10]

Thus, while it is conceded that the state has a fundamental interest in the health, safety, and welfare of children in preschool/day-care programs, the record presented warrants the conclusion that the state's legitimate purposes could be achieved in the case of these defendants by utilizing a "less obtrusive form of regulation" than licensing. *Sherbert, supra,* 374 US 407.

For these reasons, we would hold that the First Amendment's Free Exercise Clause precludes the DSS from requiring the defendants' preschool/day-care program to be licensed under the childcare organization act.[11]

II

We turn now to defendants' claims that, in

[10] In an article entitled *State regulation of social services ministries of religious organizations,* 16 Valparaiso U L R 1, 27-28 (1981), Professor Esbeck has advanced a regulatory scheme for childcare centers based on a registration system. The scheme would accommodate the religious tenets of a church-run center while requiring periodic safety and health inspections by the state. Such a proposal suggests the availability to the state of a less restrictive means for protecting its legitimate interests.

[11] Disposition on this basis would make it unnecessary to address the claim that licensing creates a potential for excessive government entanglement in church affairs in violation of the First Amendment's Establishment Clause.

addition to the licensing requirement, certain regulations promulgated by the DSS pursuant to the childcare organization act also impinge upon their First Amendment rights.

A

Rule 400.5104(2)(a), issued by the DSS, requires that the "program director [of a childcare center] shall have completed a minimum of 60 semester hours of credit at an *accredited* college or university . . . ."[12] (Emphasis added.)

No one disputes that in the view of the church and its members the program director of its preschool/day-care program is considered to be an "underpastor" of the church. At trial, Rev. Harold Asire, testified that the "number one qualification" of a program director is that the person be a "Born Again Christian." He said the defendants looked to the fundamentalist Christian colleges to find a program director because such colleges teach a Biblically-based philosophy of education. It was pointed out that some of these colleges forgo state accreditation on the ground of religious belief. Rev. Asire conceded the possibility that a person who had attended an accredited college could be acceptable as a program director, if that person were a "Born Again Christian." According to Rev. Asire, the religious beliefs of the applicant would be the paramount criterion for selection.

The DSS does not contest that the choice of a program director by these defendants would be severely circumscribed if they were limited in the

---

[12] In this appeal the DSS has not argued that we should avoid reaching the merits on the ground of lack of ripeness. To the extent that focus upon the ripeness issue is nevertheless justified, we join in the analysis and views expressed by Justice Cavanagh. *Ante,* pp 409-413.

selection to graduates of accredited colleges. We believe the record clearly establishes that the accreditation limitation places a burden upon defendants' free exercise rights. As held by the court in *Rayburn v General Conference of Seventh-day Adventists,* 772 F2d 1164, 1168 (CA 4, 1985):

> [P]erpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large.
> Any attempt by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights. [See also *Kedroff v St Nicholas Cathedral,* 344 US 94; 73 S Ct 143; 97 L Ed 120 (1952).]

The DSS nevertheless contends that "the State has a compelling interest in assuring that program directors have the minimum level of knowledge, which will enable them to adequately supervise child care staff and to design and maintain programs which are appropriate to the needs of preschool age children." At trial, the DSS introduced the deposition testimony of Dr. Norris Class, an expert witness. Dr. Class discussed the vulnerability of small children and listed risks related to childcare centers. Regarding staff qualifications, Dr. Class testified as follows:

> There are risks relating to the character defect of staff and to the lack of qualifications of staff to carry out role assignments properly and/or responsibly.

Other experts gave similar testimony on behalf of the state on the importance of director training. However, none of the expert testimony offered by

the DSS concerned the importance of program director training at an accredited college, rather than an unaccredited fundamentalist Christian school. Dr. Ruopp specifically testified that it is the type of training received that is most important, rather than the number of years involved:

We tested the hypothesis that years of education made a difference and discovered that years of education by themselves made no difference. What made a difference . . . was that caregivers had specific training in child development and daycare . . . .

The testimony of Mr. Gazan, another DSS witness, indicates that the interest of the DSS in having an accreditation requirement is to make sure that a person selected for director has in fact attended a college, rather than a diploma mill:

We at the Department of Social Services have neither the responsibility nor the ability to go around and evaluate . . . whether or not that college is or is not providing a level of academic learning that is on a college level. . . . [W]e want to be sure that the credits earned are not something that were earned by way of a hundred dollar fee with some paper mill college . . . .

Such testimony undercuts plaintiff's argument that the accreditation requirement is closely related to director qualifications. Rather, it suggests that accreditation is utilized to ensure that a director's training is not completely counterfeit. Moreover, there is record evidence that the department has issued alternative guidelines which would allow the hiring of directors from unaccredited colleges, a development which further demonstrates that the accreditation requirement is not essential to the DSS' interests.

We conclude that the DSS has failed to sustain its burden to show a compelling basis for its refusal to recognize in the case of these defendants an exemption from the accreditation requirement of Rule 400.5104(2)(a). Accordingly, we would hold the accreditation requirement unconstitutional as applied to these defendants.

B

Another of the challenged DSS regulations is Rule 400.5106(1)(c), which provides:

> (1) A center shall provide a program of daily activities and relationships that offers opportunities for the developmental growth of each child in the following areas:
>
> *  *  *
>
> (c) Emotional development, including *positive self-concept*. [Emphasis supplied.][13]

With respect to this regulation, we join in the reasoning and conclusion of Justice CAVANAGH, and add the following.

This Court said in *Woll v Attorney General,* 409 Mich 500, 533; 297 NW2d 578 (1980), that

> A statute may be challenged for vagueness on the grounds that it
> —is overbroad, impinging on First Amendment freedoms, or

---

[13] In its brief on appeal, defendants also contend that Rule 400.5107(2)(c), which prohibits "[i]nflicting mental or emotional punishment, such as humiliating, shaming or threatening a child," is unconstitutionally vague. Defendants failed to raise this claim in the trial court, the Court of Appeals, or in their application for leave to appeal in this Court. The record has thus not been developed regarding this issue, and we decline to address it. The issue has not been properly preserved. See *Napier v Jacobs,* 429 Mich 222, 227; 414 NW2d 862 (1987).

—does not provide fair notice of the conduct proscribed, or

—is so indefinite that it confers unstructured and unlimited discretion on the trier of fact to determine whether an offense has been committed. [Citing *Grayned v City of Rockford,* 408 US 104, 108-109; 92 S Ct 2294; 33 L Ed 2d 222 (1972).]

Moreover, when a law impinging on First Amendment freedoms is assailed on grounds of vagueness, a heightened standard of scrutiny is required:

"Vague laws in any area suffer a constitutional infirmity," *Ashton v Kentucky,* 384 US 195, 200; 86 S Ct 1407, 1410; 16 L Ed 2d 469 (1966) (footnote omitted), and commonly in the First Amendment area doubly so. There, perhaps more than elsewhere, statutory vagueness and statutory overbreadth are constitutional vices often related and sometimes functionally inseparable. See, e.g., *NAACP v Button,* 371 US 415, 423-433; 83 S Ct 328; 9 L Ed 2d 405 (1963). For "where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms' it 'operates to inhibit the exercise of [those] freedoms,'" *Grayned v City of Rockford,* 408 US 104, 109; 92 S Ct 2294, 2299; 33 L Ed 2d 222 (1972), quoting in turn *Baggett v Bullitt,* 377 US 360, 372; 84 S Ct 1316; 12 L Ed 2d 377 (1964) and *Cramp v Board of Public Instruction,* 368 US 278, 287; 82 S Ct 275; 7 L Ed 2d 285 (1961); and "[u]ncertain meanings inevitably lead citizens to '"steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden area were clearly marked.'" [Citations omitted.] "The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform [citizens of] what is being proscribed." *Keyishian v Board of Regents, supra,* 385 US [589] 604; 87 S Ct [675] 684 [17 L Ed 2d 629 (1967)].

Consequently, "standards of permissible statu-

tory vagueness are strict in the area of free expression." *NAACP v Button, supra,* 371 US at 432 . . . . "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity," *id.* at 433; 83 S Ct at 339; "[p]recision of regulation must be the touchstone in [that] area . . . ." *Id.* at 438 . . . . [*Buckley v Valeo,* 171 US App DC 172, 225-226; 519 F2d 821, 874-875 (1975), aff'd in part, rev'd in part 424 US 1; 96 S Ct 612; 46 L Ed 2d 659 (1976).]

A statute is vague when the conduct it forbids is so unclear that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v General Construction Co,* 269 US 385, 391; 46 S Ct 126; 70 L Ed 322 (1926).

Attempting, presumably, to justify the regulation, one of the DSS witnesses, Dr. Ruopp, testified that it was

written as a sign post rather than as a prescription, you really—you can justify just about anything you do with children that is reasonable and intelligent, all the way from, I suppose, secular humanism on the one hand to the most rigorous kind of religious training that you can give.

We agree with defendants that such testimony serves to demonstrate that because the rule is subject to such wide and varied interpretations, it is vague to the point that persons of ordinary intelligence must "guess at its meaning." *Connally, supra,* 269 US 391. "Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.' " *Grayned v Rockford, supra,* 408 US 109.

Particularly where First Amendment freedoms

are at stake, such vagueness in a regulation is constitutionally intolerable.

C

Defendants also claim that their First Amendment rights are violated by certain provisions of the childcare organization act which purport to give the DSS authority to investigate the financial condition of a childcare center.[14]

The DSS argues that its interest in insuring that basic services are provided to children in childcare centers necessitates such regulation. Yet, it is undisputed that in a policy memorandum issued by the DSS on September 10, 1974, the requirement that license applicants submit financial statements was discontinued:

> This is to inform you that the Financial Statement form (DSS-3603) is no longer to be used in connection with the application requirements for licensure or approval. Both the format and the information required is of dubious value, and provides no rule related information pertinent to determining a licensing recommendation.

---

[14] MCL 722.112; MSA 25.358(12) provides in pertinent part:

(1) The department of social services . . . is responsible for the development of rules for the care and protection of children in organizations covered by this act and for the promulgation of these rules . . . .

\* \* \*

(3) The rules promulgated under this act shall be restricted to:

\* \* \*

(c) The general financial ability and competence of applicants to provide necessary care for children and to maintain prescribed standards.

Further, MCL 722.115(1); MSA 25.358(15)(1) makes the granting of a license to a childcare organization dependent upon DSS satisfaction as to the "financial stability" of the organization.

It is expected that new applicants may desire consultation with respect to the fiscal management of a child care center. Consultation can be provided by using other sources of information, or resources much more appropriately than the aforementioned form.

Defendants contend that inspection of their financial status could entail disclosure of their funding sources. We agree that such compelled disclosure could affect free exercise rights:

[T]he invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money . . . for "[f]inancial transactions can reveal much about a person's activities, associations, and beliefs." [*Buckley v Valeo, supra,* 424 US 66.]

Even though the DSS has rescinded the practice of requiring financial disclosure by license applicants, the statutory provisions authorizing such regulation remain in effect. The potential, alone, for such inspection to occur in the future is a sufficient burden to chill defendants' decision-making process for their religiously based programs. See *Catholic Bishop of Chicago v NLRB,* 559 F2d 1112 (CA 7, 1977), aff'd on statutory grounds 440 US 490; 99 S Ct 1313; 59 L Ed 2d 533 (1979); *Surinach v Pesquera de Busquets,* 604 F2d 73 (CA 1, 1979).

The DSS has effectively conceded, through its policy memorandum, that it does not have a compelling interest in initial financial disclosure of license applicants. Further, the record in this case shows that the DSS is able to make a determination regarding whether basic services are being provided at childcare centers without financial inspection. One DSS witness, Mr. Gazan, testified:

The only time that the financial status of a

center would be a matter of concern would be if it was obvious it was interfering with the ability of that center to provide adequate staff. To pay the heat bills—and by the way, we have had actual cases where, because a licensee was not paying their heat bill, ultimately it was turned off. They were continuing to try to care for children so they could receive the income, hopefully be able to pay their bills. Then it becomes a legitimate area of our concern.

It appears that the DSS' purpose in reviewing finances is to ascertain otherwise observable facts, i.e., whether adequate staff, heat, and the like is provided. Particularly in view of the fact that the DSS has introduced no evidence to show that any such problem has ever existed with respect to defendants' preschool/day-care programs, we conclude that application of the financial inspection and disclosure requirements of the act to these defendants would violate their right to free exercise of religion under the First Amendment.

### D

Finally, defendants follow a literal interpretation of the Biblical admonition, "Spare the rod, spoil the child." The preschool/day-care staff uses a Ping-Pong paddle to spank children when such discipline is deemed necessary.[15]

The childcare organization act authorizes the DSS to promulgate rules for "discipline of children." MCL 722.112(3)(j); MSA 25.358(12)(3)(j). Rule 400.5107(2)(a) provides:

(2) Staff shall be prohibited from . . . (a) [h]it-

---

[15] We would note, however, that Pastor Harold Asire testified at trial that he did not recall corporal punishment being administered at the preschool more than "half a dozen times in those whole eight years [since the start of the preschool]."

ting, shaking, biting, pinching, or inflicting a form
of corporal punishment.[16]

Defendants assert that the plain language of
this rule burdens the exercise of their religious
belief that the use of corporal punishment to
discipline children is required by the Bible. While
conceding that the rule "may well be burdensome
on Defendants' free exercise of religion," the state
contends that its interest in protecting the health
and well-being of children overrides any burden
placed on defendants' rights. As stated by the
Court of Appeals:

> The state's interest is clear and compelling. The
> rule protects very young children from physical
> harm by prohibiting potentially abusive forms of
> discipline. Child abuse by adults is a major risk to
> children receiving daily out-of-home care in day-
> care centers. Children in age ranges 2½ to 6 are
> not likely to protest abusive punishment. Thus,
> although the prohibition against spanking with a
> Ping-Pong paddle burdens the church's free exer-
> cise of its religious beliefs, the state's interest in
> protecting its very young outweighs the burden. In
> so holding, we recognize that some practices rooted
> in religious principle may be dangerous to the
> health and welfare of certain members of society.
> [150 Mich App 271.]

Other courts have recognized the profound inter-
est of the state in preventing the infliction of
physical or emotional harm to children in child-
care center facilities by means of corporal punish-
ment. See, e.g., *Forest Hills Early Learning Cen-
ter, Inc v Lukhard,* 661 F Supp 300, 312-313 (ED
Va, 1987), rev'd on other grounds 846 F2d 260 (CA

---

[16] The DSS issued an interpretative guideline for Rule 400.5107(2)(a)
on May 19, 1980, which permitted the use of spanking with the open
hand in childcare centers under certain conditions. The guideline was
rescinded on December 18, 1986.

4, 1988); *State ex rel Pringle v Heritage Baptist,* 236 Kan 544; 693 P2d 1163 (1985); Johnson v California State Dep't of Social Services, 123 Cal App 3d 878; 177 Cal Rptr 49 (1981).

In this instance, we agree with the reasoning of the Court of Appeals, and we conclude that Rule 400.5107(2)(a) may be constitutionally applied to defendants despite the possible burden on religious conduct.

Accordingly, we would affirm in part and reverse in part the decision of the Court of Appeals.

RILEY, C.J., and LEVIN, J., concurred with GRIFFIN, J.

BOYLE, J.

### INTRODUCTION

We conclude that a compelling state interest in protecting children in childcare centers from physical and emotional harm justifies the imposition of the licensure requirement. We would affirm the decision of the Court of Appeals to the extent it holds compliance with the licensure requirement does not violate the defendants' constitutional rights under the Free Exercise or the Establishment Clauses of the First Amendment, and that the defendants must comply with the regulation prohibiting corporal punishment.

We would vacate that portion of the opinion addressing the program content regulation, finding the rule void on its face because it is overbroad and presents a realistic danger that the rule will compromise First Amendment rights, specifically the freedoms of religion and speech. We would also vacate those portions addressing the program director regulation, finding any issues relating to the

rule not ripe for review,[1] and the financial inspection regulation, finding any issues relating to the rule moot.

I

The Court must determine whether the State of Michigan, Department of Social Services, may constitutionally require the Emmanuel Baptist Church to obtain a license and comply with certain administrative rules in the childcare organization act, 1973 PA 116, in order to operate its preschool and day-care programs,[2] or whether the requirement that the defendants comply with the act constitutes a violation of defendants' rights guaranteed by the Free Exercise and Establishment Clauses of the First Amendment of the United States Constitution.

The defendants' request for exemption is premised on a sincerely held belief which is asserted as being in conflict with and thus burdened by the state requirement. Tribe, American Constitutional Law (2d ed), § 14-12, p 1242. The free exercise inquiry asks whether government has placed "a substantial burden," *United States v Lee,* 455 US 252; 102 S Ct 1051; 71 L Ed 2d 127 (1982), on the observation of a central religious belief or practice; if so, the state will prevail only if a compelling interest justifies the burden. *Hernandez v Comm'r of Internal Revenue,* 490 US —; 109 S Ct 2136; 104 L Ed 2d 766 (1989).

---

[1] The DSS never has brought action to compel the defendants to comply with the express terms of the regulations in order to be licensed or to revoke the defendants' license for failure to comply with any of the regulations, thus subjecting them to possible criminal prosecution.

[2] The preschool and day-care programs do not meet the exemption criteria for religious organizations in the childcare organization act, as amended by 1980 PA 510, MCL 722.111(e)(i); MSA 25.358(11)(e)(i), because the programs operate for longer than three hours a day.

We recognize that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v Comm'r of Internal Revenue, supra,* p 786, citing *Thomas v Review Bd Ind Employment Security Div,* 450 US 707, 716; 101 S Ct 1425; 67 L Ed 2d 624 (1981). The standard for evaluating free exercise claims has not been consistently articulated by the United States Supreme Court. However, unless an allegation of a burden on a sincerely held religious belief is to automatically require invalidation of a licensing regulation and an entitlement to exemption, a court cannot analyze the purpose or compelling interest of the state without fully addressing the nature and extent of the burden on a claimant's First Amendment rights.

Thus, we agree fully with Justice CAVANAGH's view that before a court applies the strict scrutiny, compelling state interest, and no less restrictive alternative formulation, the significance of the burden on the activity must be evaluated. *Ante,* pp 394-395. Lupu, *Where rights begin: The problem of burdens on the free exercise of religion,* 102 Harv L R 933, 934 (1989).[3] In weighing the state's interest and the claimant's request for exemption, circumspection is the watch word.[4]

---

[3] While Professor Lupu criticizes the prevailing judicial definitions of burden, fearing the creation of an intolerable risk of discrimination against unconventional religious practices and beliefs and threatens to narrow the protection of religious liberty overall, he recognizes this is the manner in which such claims are addressed in recent cases by the Supreme Court. *Id.,* p 936.

[4] Professor Tribe also observes in Supreme Court holdings "a recurring polarity" between

> those government measures (1) that put an individual to a choice between adherence to religious duties and enjoyment of government benefits . . . and (2) those government measures

Two recent controversies resolved by the United States Supreme Court highlight the significance of defining a constitutionally significant cognizable burden upon free exercise. See *Lyng v Northwest Indian Cemetery Protective Ass'n,* 485 US 439, 464-465; 108 S Ct 1319; 99 L Ed 2d 534 (1988); *Jimmy Swaggart Ministries v California Bd of Equalization,* 493 US —; 110 S Ct 688; 107 L Ed 2d 796 (1990). In these cases the conclusion that the harms inflicted by the challenged government policies were not the sort that would trigger the protection of the Free Exercise Clause made further constitutional analysis unnecessary. Lupu, *supra,* p 935.

The extent of the required showing is not clear or articulated the same in each case. What is clear from the analysis employed by the United States Supreme Court in *Lyng* and *Swaggart* is that neither *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972), nor *Sherbert v Verner,* 374 US 398; 83 S Ct 1790; 10 L Ed 2d 965 (1963), set the standard for all claims of violation of the free exercise of religion and that the existence of an effect on a sincerely held religious belief does not in and of itself require the state to demonstrate a compelling state interest and no less restrictive alternative.[5]

that are not triggered by the religious choice in question but burden religious activity only in a manner ancillary to an undeniable secular choice. Rules in the first category are subject to higher scrutiny. . . .

In contrast, rules in the second category, although they do have an incidental effect of burdening religiously motivated choices, are neither cast in terms of religious faith nor triggered by religiously motivated choices. . . . In this second category, there is more room for courts to balance the state's interests against the religious adherents' interest without imposing on the state a burden of proving that granting exemptions would sacrifice a crucial state policy. [Tribe, *supra,* § 14-13, pp 1262-1263.]

[5] In addition, as we observed in *Sheridan Road Baptist Church v*

In *Sherbert v Verner, supra,* the Court applied traditional strict scrutiny and held that plaintiff's disqualification for workers' compensation benefits abridged her right to the free exercise of religion. Although the burden was "indirect," the ineligibility ruling forced plaintiff to choose between forfeiting benefits or abandoning one of the precepts of her religion. "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.,* p 404. In *Wisconsin v Yoder, supra,* p 219, the Amish persuasively established a practice which pervaded their mode of life and which "would [have been] gravely endanger[ed] if not destroy[ed]," by the state's requirement of compulsory formal education after the eighth grade.

Despite the fact that the United States Supreme Court has consistently reiterated the strict scrutiny test, application of the test to situations other than government benefits or the *Yoder* case suggest distinct, although as yet not fully articulated, methodology. The Court has not employed a mechanistic approach to all free exercise claims and a multifactored balancing process is at work.

When this Court recently addressed the Free Exercise Clause in *Sheridan Road Baptist Church v Dep't of Ed,* 426 Mich 462, 486; 396 NW2d 373

---

*Dep't of Ed,* 426 Mich 462, 486; 396 NW2d 373 (1986), and as Professor Tribe has explained:

> [P]revious cases required the state to show that it was pursuing a compelling interest, narrowly defined, and that an exemption would defeat that interest; [*United States v Lee,* 455 US 252; 102 S Ct 1051; 71 L Ed 2d 127 (1982)] seems to require the state to show only that it is pursuing a compelling interest, broadly defined, and that an exemption would "unduly interfere" with the interest. [Tribe, *supra,* § 14-13, pp 1261-1262.]

See also note, *Burdens on the free exercise of religion: A subjective alternative,* 102 Harv L R 1258 (1989).

(1986), cert den 481 US 1050 (1987), the central
focus of the plaintiff's general objection was, as in
this case, that licensure itself interfered with the
church's sovereign right to minister.[6] Our effort
here, as it was then, is to articulate the appropri-
ate method to resolve the claim, stemming from
our conviction that Supreme Court precedent does
not mandate unvarying application of the strict
scrutiny applied in *Yoder*.[7]

II

The conclusion that the United States Supreme
Court would apply the *Yoder* test to the licensing
requirement on the record before us ignores the
fact that the Court has expressly distinguished
*Yoder* as a case that involved not merely an effect
on religious activity, but a compulsion by the state
to coerce the plaintiffs to act contrary to their
religious beliefs.

The claimant's showing of sincerity that its
religious beliefs are burdened if its organization is
required to abide by the state requirements at
issue will not always be sufficient unless it can

---

[6] In *Sheridan Road,* this Court considered whether a statute requir-
ing nonpublic school teachers to be certified was constitutional. An
equally divided Court affirmed the holding of the Court of Appeals
that the certification requirement violated neither the Free Exercise
nor the Establishment Clauses of the First Amendment of the United
States Constitution.

The plurality position concluded the burden on the plaintiff's
religious beliefs to be minimal or, as we noted in the concurrence,
"indirect and minimal" in relationship to the state's paramount
interest in education. Alternatively, the opinion of Justice RILEY,
joined by Justice CAVANAGH and Justice LEVIN, indicated that any
burden on free exercise could only be justified by a showing on the
part of the state that the regulation in question was not only essen-
tial in order to fulfill its interest in education, but that no less
burdensome alternatives existed.

[7] There is no talisman for resolution of free exercise claims and
that "[t]he difficulty in articulating a standard . . . pales consider-
ably in comparison to the difficulty encountered in the application of
the standard." *Sheridan Road*, pp 489-490.

also demonstrate a significant burden.[8] See *Tony & Susan Alamo Foundation v Secretary of Labor*, 471 US 290; 105 S Ct 1953; 85 L Ed 2d 278 (1985). Thus, initially the inquiry is whether

> "[the] government has placed a *substantial burden* on the observation of a central religious belief or practice . . . ." [Emphasis added. *Jimmy Swaggart Ministries, supra*, 107 L Ed 2d 806, citing *Hernandez, supra*, 104 L Ed 2d 786.][9]

In addition, even in circumstances in which the United States Supreme Court has acknowledged that the claimant's beliefs are sincere and that the government's proposed actions would have severe adverse effects on the practice of its religion, "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, [do not] require [the] government to bring forward a compelling justification for its otherwise lawful actions." *Lyng, supra*, pp 450-451.

[8] For example, a state's refusal to award unemployment benefits was held to violate the First Amendment where a worker was discharged for refusing to work on her sabbath. *Hobbie v Unemployment Appeals Comm of Florida*, 480 US 136; 107 S Ct 1046; 94 L Ed 2d 190 (1987).

[9] Admittedly, facially neutral legislation may give rise to a burden on religion if it forces individuals to choose between abandoning their religious beliefs or sacrificing an important government benefit. See *New Jersey State Bd of Higher Ed v Shelton College Bd of Directors*, 90 NJ 470; 448 A2d 988 (1982).

The New Jersey court determined the statute, which prohibited the conferring of degrees or the furnishing of instruction for that purpose except by licensed institutions, did require the defendant to choose between a tenet of its religion and the privilege of conferring baccalaureate degrees. However, the court concluded that although the licensing statutes as applied to Shelton College imposed some burden on the exercise of religion, and as such the defendant's freedom of religion could suffer from this legislation the constitutional balance nonetheless favored the state interest in uniform application of higher laws. *Id.*, pp 482-483.

The defendants' religious objection to the licensing requirement is not that their religion precludes having a license but, rather, that the "function" of the license implies that the state is sovereign and could withdraw permission for religious activity that is mandated by religious belief.[10] Dr. Asire's testimony carefully focused on his belief that the "function" of licensing is to imply the state's authority to forbid the day-care ministry.[11] He also testified, however, that a parishioner who enrolled a child in a licensed day-care center would not be violating a fundamental tenet of the faith. Defendants' expert Dr. Rushdoony testified that there was no religious objection to having a driver's license. Thus, it is not licensure that violates defendants' belief, but the symbolic significance of the license in relation to the ministry of childcare.[12] The state's guideline precluding the

[10] Dr. Asire, the pastor and administrator of the school, testified he did not consider it to be against the fundamental tenets of the Baptist fundamentalist faith to enroll a child in a licensed day-care center. He also noted that whether a child should be placed in a day-care center licensed by the DSS was a decision to be made by the individual parent.

[11] The defendants have shown that they abhor licensure as a general proposition, and assert that the operation of the preschool is a religious ministry, that "it is the function of a license that causes the religious objection." However, the defendants have not shown that it violates the tenets of their faith to obtain a license, nor have the defendants presented evidence that the DSS has ever attempted to regulate the religious program or suppress the exercise of religious beliefs at the preschool. In sum, the burden in this case is the result of a rule that is as Professor Tribe has stated:

[A]n incidental effect of burdening religiously motivated choices, are neither cast in terms of religious faith nor triggered by religiously motivated choices. [Tribe, *supra,* § 14-13, p 1263.]

[12] Similar facts have led other courts to an opposite conclusion, *State ex rel Pringle v Heritage Baptist Temple, Inc,* 236 Kan 544; 693 P2d 1163 (1985). In *Heritage Baptist,* the reviewing court upheld the trial court's finding that defendant's genuine belief that it should maintain a day-care center was not a religious belief, based on the

use of spanking except with the open palm, by contrast, directly conflicts with and substantially burdens appellant's belief that to spare the rod is to spoil the child.

In its most recent decision in the free exercise area, *Swaggart, supra,* the United States Supreme Court reiterated that a regulation neutral on its face may offend the constitutional requirement if it unduly burdens the rights guaranteed by the Free Exercise Clause. Noting the distinction between the sales tax at issue and a flat license tax imposed as a restraint in advance of press and religion, the Court observed that the tax at issue applied to all sales and was not a tax on the right to disseminate religious ideas, information, or beliefs per se. More significantly for the instant case, Justice O'Connor further observed for the unanimous Court:

> [B]ecause appellant's religious beliefs do not forbid payment of the . . . tax, appellant's reliance on *Sherbert v Verner,* 374 US 398 (1963), and its progeny is misplaced . . . . Appellant has never alleged that the mere act of paying the tax, by itself, violates its sincere religious beliefs.
>
> We therefore conclude that the collection and payment of the generally applicable tax in this case imposes no constitutionally significant burden on appellant's religious practices or beliefs. [*Swaggart, supra,* 107 L Ed 2d 810-811.]

While we acknowledge the obviously distinct factual context, we observe that licensure, like the

---

lower court's findings that Heritage Baptist Temple, Inc., had been licensed for nine years, the change in the church's position coincided with changes the new minister had initiated, and the existence of the childcare center was in part based on economic necessity. Additionally, the court noted that the church was unable to show that independent Baptist doctrine mandated all churches to have day-care centers. *Id.,* p 547.

tax in *Swaggart,* involves a neutral regulation and a less direct conflict between defendants' belief and the statute than those established in *Sherbert* and *Yoder.* The defendants do not object to licensure because licensure places any restriction on what they may believe or what they may do. *Bowen v Roy,* 476 US 693; 106 S Ct 2147; 90 L Ed 2d 735 (1986). Licensure, qua licensure, does not force the defendants to choose between a religious duty and enjoyment of government benefits or coerce the defendants to give up their religious beliefs on pain of prosecution.[13] Thus, reliance on *Yoder* and *Sherbert* for the proposition that the licensure requirement imposes a constitutionally significant burden seems misplaced.[14] *Ante,* p 393.

Were the state to assert a right to determine

[13] In no sense has the state conditioned receipt of an important benefit upon conduct proscribed by a religious faith, or denied such a benefit because of conduct mandated by religious belief, or thereby putting pressure on the defendants to modify their behavior or violate their beliefs. See *Hobbie v Unemployment Appeals Comm of Florida,* 480 US 136, 141; 107 S Ct 1046; 94 L Ed 2d 190 (1987), citing *Thomas v Review Bd Ind Employment Security Div, supra,* pp 717-718.

[14] There is no support in the record for the statement that the licensing law requires a church applicant to violate its religious beliefs by obtaining the license. Opinion of Justice CAVANAGH, *ante,* p 399.

In fact, there are no cases in which the courts have found that a licensing requirement similar to that at issue in this case is a violation per se of the free exercise of religion, and that consistently, the United States Supreme Court has recognized that the state's power to regulate secular activities of religious organizations extends to private, religious schools. *Pierce v Society of Sisters,* 268 US 510, 534; 45 S Ct 571; 69 L Ed 1070 (1925).

Further, on appeal, the United States Supreme Court and state supreme courts have upheld lower courts' decisions enforcing licensing requirements for day-care and residential childcare centers. See *Heritage Baptist,* n 12 *supra; Kansas v Heart Ministries, Inc,* 227 Kan 244; 607 P2d 1102 (1980); *Texas v Corpus Christi People's Baptist Church, Inc,* 683 SW2d 692 (Tex, 1984); *Roloff Evangelistic Enterprises, Inc v State,* 556 SW2d 856 (Tex Civ App, 1977). In *Heart Ministries, Corpus Christi,* and *Roloff,* the United States Supreme Court dismissed appeals for want of a substantial federal question, which, unlike a denial of a petition for writ of certiorari, is a ruling on the merits of the case. *Hicks v Mirandez,* 422 US 332, 343-344; 95 S Ct 2281; 45 L Ed 2d 223 (1975).

whether there is a need for defendants' day-care center, for example, an intrusion into defendants' evangelical activities analogous to that presented by the corporal punishment guideline would be presented. Having reviewed the record, mindful that " 'First Amendment questions of "constitutional fact" compel [the] Court's de novo review,' "[15] we conclude that the requirement of a license in this case does not impose a "constitutionally significant" burden on defendants' religious practices or beliefs.

Alternatively, assuming the United States Supreme Court would find that licensure, qua licensure, is a constitutionally cognizable burden in these circumstances, we agree with Justice CAVANAGH that the burden is clearly not unconstitutional.[16] This state recognizes that the governmental interest involved, "the care and protection of

[15] New Life Baptist Church Academy v East Longmeadow, 885 F2d 940, 941 (CA 1, 1989), cert den 494 US —, citing Rosenbloom v Metromedia, Inc, 403 US 29, 54; 91 S Ct 1811; 29 L Ed 2d 296 (1971).

[16] See United States v Lee, supra, p 259. In Lee, the Court stated that "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." Id., pp 257-258. See also Tribe, supra, § 14-13, p 1262. Another commentator describes the balancing process as follows:

> In balancing the interests the court must first determine the degree of burden on the religious practice. Then, *in assessing the state's interest, the court will have to determine the importance of the secular interest and the extent to which that interest would be impaired by an exemption for the religious practice.* If the state interest is truly compelling, there will be no requirement that the state diminish the effectiveness of its regulation by granting the exemption. However, if the state could achieve its goal as well by a means which would not burden the religious practice, it will be required to adopt the alternative means. If the state's interest is of a lesser magnitude it will be required to grant the exemption and accept a less effective means of fulfilling its goal. [Nowak, Rotunda & Young, Constitutional Law (3d ed), § 17.6, p 1069. Emphasis added.]

children, has long been a matter of utmost state concern."[17] See, for example, *Fisher v Fisher*, 118 Mich App 227, 232; 324 NW2d 582 (1982). Further, should the Court focus on the purpose of the licensure requirement, the same conclusion must be reached.[18]

---

[17] If the exemption were granted, the result could be substantial deregulation of childcare centers. There are approximately 2,300 childcare centers in the State of Michigan with approximately 120,000 children in care. Nearly twenty percent of these childcare centers are operated by churches. Thus, 24,000 children might be affected. As noted during the trial, there are major risks to preschool age childern in day care:

(1) The more obvious catastrophic risks relating to fire, improper sanitation and improper building construction;

(2) Risks deriving from the location of the childcare facility, including environmental hazards such as traffic and pollution;

(3) Risks associated with plant operation, including lighting, heating and ventilation;

(4) Risks arising from insufficient staff;

(5) Risks related to the lack of character or qualifications of staff to carry out their responsibilities;

(6) Risks relating to improper nutritious care of the children while in day-care facilities;

(7) Risks related to the health of the staff and children under their care;

(8) Risks related to the lack of proper planning, "especially in relation to active and passive play and the imbalance of activity and rest";

(9) Risks of "child abuse, including excessively severe disciplinary practices";

(10) Risks related to "insufficient and improper equipment and toys, including those which are hazardous and inappropriate to the ages of the children";

(11) Operational risks, "including the reception of sick children . . . the improper release of children and the transportation of children."

[18] One of the concerns prior to passage of the act was that agencies were being given regular licenses although they had not proven they could adequately care for children. House Legislative Analysis, HB 4321, May 7, 1973.

It is unnecessary that the state produce evidence of harm to the health or welfare of those children attending the defendants' preschool/day-care program in order to justify the denial of a religious exemption from the licensing requirement. Justice Griffin, *ante*, pp 438-439. We note that the deficiencies of an alternative to licensure,

The defendants concede that the state's interest in protecting the health and safety of young children "is of the highest order," but dispute that the state has identified a compelling interest in licensing and regulating day-care facilities or regulating preschool programs. The defendants' conclusion is based on the fact that, unlike the interest in compulsory education in *Yoder,* the "state has never asserted an interest in having all children exposed to a preschool/day-care program in order to advance and enhance their social, physical, intellectual, and emotional development."[19] The fact that an activity is mandated by the state is evidence of the state's interest. But the opposite is not true. The fact that the state has not mandated an activity is not dispositive of the state's interest in the subject matter.

Finally, while we observe it is difficult to under-

or an exemption from licensure entirely, would be discovered only after the damage had occurred—harm to the health and welfare of preschool children.

As Chief Justice WILLIAMS observed in *Sheridan Road,* when addressing standardized testing of private school students as a proposed less restrictive alternative to the requirement of certification for teachers in nonpublic schools:

> We are also satisfied that there is no less intrusive method by which the state could satisfy its interest in the education of its citizens. The only alternative which has been proposed is standardized testing of private school students. This is an inadequate substitute because deficiencies in teaching would be discovered only after the damage has occurred. *State v Shaver,* 294 NW2d 883 (ND, 1980). Further, we are not persuaded that testing would guarantee less intrusion by the state into the functioning of the private schools. See, e.g., [*State v Rivinius,* 328 NW2d 220, 229 (ND, 1982)]. [*Sheridan Road, supra,* p 484.]

[19] For example, the state has never asserted an interest in having all people over seventy years of age exposed to nursing home day-care programs. It is difficult to imagine, however, that the state would not have a compelling interest in a licensure requirement for nursing homes. Thus, it is simply a non sequitur to define the nature of the state's interest in terms of whether the state itself has affirmatively been involved in supplying the services sought to be regulated.

stand how registration which would also function to imply the state's approval to operate the day-care center is less burdensome than licensure,[20] we acknowledge that the "incomprehensibility of a religious belief," is not a "reason to refuse to accord it the protection of the First Amendment." Opinion by Justice CAVANAGH, *ante,* p 406. Rather, we point out only that if the burden on the defendants' free exercise of religion is the power to withdraw approval, and a day-care center can operate only with the state's approval under either registration or licensure, this argument would admit of no limitation.[21]

Therefore, on the basis of the minimal and indirect burden the licensure requirement imposes on the defendants' exercise of religion, and of the substantial state interest in protecting the health and welfare of preschool children being cared for outside their homes and the logical nexus between the interest to be attained and the means of attaining it, or on the basis that there is no less restrictive alternative to satisfy the state's compelling interest, we would hold that the state may

[20] The alternative to licensure offered by the defendants is a registration program, similar to that allowed for family day-care centers, where six or less children are cared for at any one time. Under the registration program, a home day-care center can begin operation after notification of the state of the intention to do so, and within a ninety-day period the state will conduct an inspection of the home. The state can take action in the event it finds the home is not providing the services in a manner that guarantees the health and safety of the children by revoking or refusing to renew a certificate of registration. MCL 722.115, 722.121; MSA 25.358(15), 25.358(21).

[21] The registration requirement undeniably involves and implicates the defendants, at least to a degree, in the very process to which it objects, i.e., the defendants will have to obtain the state's approval for the day-care center and the conditions of the center even if it were registered rather than licensed.

Further, the defendants, while asserting that registration is less intrusive, have not concluded that registration is acceptable, but only that the "registration program there is *much closer* to an arrangement which would be an acceptable arrangement." (Emphasis added.)

constitutionally require the defendants to comply with the licensure requirement of 1973 PA 116.

## III. THE REGULATIONS

In addition to the licensing requirement itself, the defendants contend that particular regulations promulgated pursuant to the childcare organization act impinge upon their First Amendment rights. Although the lower courts addressed the merits of this issue, it must first be observed that these regulations have never been applied to the defendants. This presents an additional issue which this Court has a duty to address, that is, whether the condition precedent to the relief sought by the defendants regarding these regulations has been shown.[22] *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978).

Contrary to the assertions made by the defendants the free exercise claims regarding the regulations are not ripe for review.[23] The DSS has never brought any action to compel the defendants to comply with the regulations, either in order to be licensed or to prevent revocation of a license.[24]

---

[22] The defendants have anticipated this concern and have addressed the issue in their brief.

[23] Justice Cavanagh incorrectly concludes the challenged agency action in *Detroit Base Coalition for Human Rights of the Handicapped v DSS,* 431 Mich 172; 428 NW2d 335 (1988), was the intention of the DSS to implement telephone hearing procedures. *Ante,* p 410, n 42. However, the action challenged was the failure of the agency to follow "the notice and public-hearing requirements of §§ 41 and 42 of the APA before issuing the directive mandating the telephone hearings." *Coalition for Human Rights,* p 191. This Court determined the challenge to the new procedures was not speculative or without a factual basis, which is why we determined that the parties had standing to contest the implementation of a rule without following correct procedures. The issue was not whether the claim was ripe for review, and the analysis employed in that case has no application to the present case.

[24] Initially, the defendants informed the DSS that they no longer wished to be licensed. Subsequent to this decision, the DSS sought

Thus, there is not an adequate factual record upon which to determine the validity of the claims made by the defendants that the

> factual record is too well developed to have any valid basis for conjecture as to the defendants' "fear of prosecution" arising from the possibility that the plaintiff will deny a license for their failure to comply with Rule 104. By maintaining this action, and by its prior enforcement actions, the plaintiff has provided a "palpable basis" for assuming the license will be revoked.[25] [Opinion of Justice CAVANAGH, *ante*, p 411.]

We are compelled to emphasize that this is *not* a situation in which the defendants have been denied a license or threatened with revocation of their license unless they comply with the express terms of the regulations. In fact, the defendants themselves informed the DSS that they refused to be licensed. Thus, there is no support for the claim that after extensive consultations with the defen-

injunctive and declaratory relief to prevent the defendants from operating an unlicensed childcare center and to declare the defendants subject to the requirements of the childcare organization act pertaining to the licensing of childcare centers. In response to the action taken by DSS, the defendants sought declaratory and injunctive relief against the enforcement of both the licensure requirement of 1973 PA 116 and certain regulations promulgated thereunder.

25 In *Clements v Fashing,* 457 US 957, 962; 102 S Ct 2836; 73 L Ed 2d 508 (1982), the Court addressed a situation in which the performance of the challenged action automatically triggered sanctions unlike the present case. See opinion of Justice CAVANAGH *ante,* p 410, n 43.

While it is true that one does not have to expose oneself to actual arrest or prosecution to be entitled to challenge the statute, persons having no fear of prosecution except those that are imaginary or speculative are not accepted as appropriate plaintiffs. See *Steffel v Thompson,* 415 US 452, 459; 94 S Ct 1209; 39 L Ed 2d 505 (1974); *Younger v Harris,* 401 US 37, 42; 91 S Ct 746; 27 L Ed 2d 669 (1971); *Regional Rail Reorganization Act Cases,* 419 US 102, 138; 95 S Ct 335; 42 L Ed 2d 320 (1974); *Pacific Gas & Electric Co v State Energy Resources Conservation & Development Comm,* 461 US 190; 103 S Ct 1713; 75 L Ed 2d 752 (1983).

dants regarding the accreditation aspects of the rule, "[t]he DSS refused to provide a license to defendants, in part because they employed program directors who had received degrees from unaccredited schools (and who, as a result, were found not to be in compliance with 1979 AC, R 400.121[3])." Opinion of Justice Cavanagh, *ante,* p 408.

In this case when the defendants informed the DSS that they refused to be licensed, the state brought an action to prevent them from operating the childcare center without a license and requested the court to declare that the defendants were subject to the childcare act. The state has never brought an action to compel strict compliance with the regulations and, further, although the act provides for exemptions from the regulations, the defendants have made no attempt to secure an exemption from any of the rules.[26]

Since the state has never applied the regulations and the defendants have never applied for the exemption, there is not a developed factual background against which this Court can intelligently assess the defendants' claim that any of the regulations place a significant burden on their free exercise of religion, or that the state would not exempt the defendants from the regulations in a manner which would not burden the free exercise

---

[26] 1980 AACS, R 400.5118(1) provides:

> Upon written request of an applicant or licensee, the department may grant an exemption from an administrative rule if there is clear and convincing evidence that the alternative to the rule complies with the intent of the administrative rule from which exemption is sought.

Contrary to Justice Cavanagh's conclusion, I believe that there is an adequate administrative alternative to challenging the constitutionality of all the rules, including 1980 AACS, R 400.5104. *Ante,* pp 415-417.

of their religion. Thus, it is not possible for the Court to determine the validity of the defendants' claims that compliance with the terms of the regulations involves direct "coercive" burdens on their free exercise of religion.

While a declaratory judgment is intended to provide a broad flexible remedy to make the courts more serviceable to the people, the prudent use of judicial resources requires sufficient pleading and proof to present the court with a defined issue, shaped and sharpened by the adversarial posture of the parties. Here, where both the activity suggested and the reaction to it are merely hypothesized, we would find declaratory relief inappropriate because the decision requested would be purely advisory and the issues are not ripe for review.[27] In addition, MCR 2.605, the actual controversy requirement, requires that the Court not decide moot questions in the guise of giving declaratory relief. See *McMullen v Secretary of State,* 339 Mich 175; 63 NW2d 599 (1954).

### A. PROGRAM DIRECTOR

This Court has been asked to determine whether an exemption to the program director requirement is constitutionally mandated because the accreditation limitation in selecting a director places a burden on the defendants' free exercise of their religious beliefs.[28]

The defendants believe the accreditation require-

[27] We do not include the cases noted in Justice CAVANAGH's opinion, p 412, n 47, in the context of our discussion of why defendants' claims regarding the regulations are unripe because we find that, aside from the fact that they involve declaratory judgment actions, the holdings and discussion are simply not significant to resolution of the questions in the case now before this Court.

[28] 1980 AACS, R 400.5104(2)(a) provides that a childcare center "program director shall have completed a minimum of 60 semester hours of credit at an accredited college or university."

ment directly conflicts with their religious beliefs because the very act of proscribing any standard burdens the defendants' right to free exercise of religion.[29] We do not reach the merits of this issue since we conclude that the defendants' claim regarding the program director regulation is not ripe for review.

The complaint filed by DSS *did not* seek "inter alia, to enjoin the operation of the preschool until the defendants would supply documentation of the fact that their program directors complied with Rule 104 in conformity with its interpretation of the predecessor regulation, R 400.121(3)."[30] Opinion of Justice CAVANAGH, *ante*, p 409. Further, there is *nothing* in the record which supports the conclusions that the credentials of defendant's current program director were the occasion for the state's requested injunctive action, or that the state will force defendants to cease operations if at some future time they hire a director whose credentials are not as expressly required under Rule 104.[31]

---

[29] The trial court held Rule 400.5104(2) usurps the defendants' prerogative to select staff for the ministerial program and thus prevents the defendants from selecting a director from a college that holds beliefs compatible with theirs and concluded that application of the regulation to be an impermissible burden on the defendants' free exercise of religion.

The Court of Appeals reversed the decision of the trial court, finding the rule posed a constitutionally insignificant burden on the defendants' free exercise of religion.

[30] There is no factual basis for this conclusion. In fact, the complaint only contains information that following an inspection of the defendants' day-care center, on November 29, 1978, the defendants were found to be in violation of the act due to the failure, in part,

> [t]o provide documentation to establish that the center was in compliance with Administrative Rule R 400.121(3) requiring the director or person in charge of a day care center to have a minimum of two years of study at the college level.

The wording of the complaint does not even mention anything regarding an accredited university, only that the defendants must at least supply some information regarding the director's qualifications.

[31] As support for the conclusion that defendants claim is ripe for

There is no evidence that if defendants decided to comply with the licensure requirement, that the state would deny them a license on the basis that the program director did not attend an accredited college or university.[32] The regulation simply reflects the state's intention to guard against the risk of operating a childcare center under the guidance of an unqualified individual, and Rule 400.5118(1), which provides for exemptions if used by the defendant, provides a method of avoiding any burden imposed by the rule.[33]

### B. FINANCIAL DISCLOSURE

MCL 722.115(1); MSA 25.358(15)(1) requires the DSS to investigate the financial responsibility of an applicant for a childcare center license. We agree with the Court of Appeals that there is a lack of

review, Justice CAVANAGH notes:

> The result of granting the state's prayer for declaratory relief would be that the court could immediately order, pursuant to this litigation, that the defendants cease operation of their preschool until such time as they comply with Rule 104.
> Therefore, the result of the plaintiff's filing of these proceedings is that defendants face a real and immediate threat of irreparable injury to the constitutional rights they alleged (in their answer to plaintiff's complaint) to be infringed by Rule 104. [*Ante,* p 409.]

[32] Further, there is no basis for the conclusion or assumption that the state will prevent the defendants from selecting a director from a college that holds beliefs compatible with their beliefs.

[33] The evidence also makes clear that the DSS has sought to accommodate certain fundamental Christian groups in regard to this requirement. First, the DSS would determine whether the college in question is accredited by a list of accrediting agencies, including the American Association of Bible Colleges. Second, if the first step fails, the DSS would determine whether any of the state colleges or universities in Michigan would accept credits from the college in question on a transfer basis. Third, if the second step fails, the DSS would determine whether any of the state colleges or universities from the state where the college in question is located would accept credits from a college on a transfer basis.

evidence in the record to show an actual infringement upon the free exercise of defendants' religion resulting from the enforcement of this regulation in 1974. Therefore, we find that the defendants' claims that their rights of freedom of religion and freedom of association have been violated by the mere existence of the regulation relating to financial disclosure are not ripe for review.[34]

Further, since the requirement for applicants to submit a financial statement was discontinued by a policy memorandum issued on September 10, 1974, we also find that the issue is moot.[35] We do not agree with Justice GRIFFIN's conclusion that the "potential, alone, for such inspection to occur in the future is a sufficient burden to chill defendants' decision-making process for their religiously based programs."[36] *Ante,* p 450.

Further, *Catholic Bishop of Chicago v NLRB,* 559 F2d 1112 (CA 7, 1977), aff'd 440 US 490; 99 S Ct 1313; 59 L Ed 2d 533 (1979), does not provide any authority for the conclusion that the claimant need only make a showing of a remote possibility of a conflict with the religious clauses of the First

[34] On August 8, 1974, the defendants completed the financial statement of the DSS as part of the application for a license to operate the preschool as a childcare center. At no time have the defendants claimed that complying with the requirement itself infringed upon the free exercise of religion, nor have the defendants shown that the potential for an inspection in the future creates excessive administrative entanglement.

[35] The defendants assert that there is a potential for an inspection to occur because even though the DSS has indicated that the financial records of the defendants will not be investigated, the statutory provision remains in effect.

[36] Nor do we agree with Justice CAVANAGH's conclusion that "defendants' claims regarding the financial disclosure provisions were timely raised below and are justiciable now" and thus this situation constitutes an exception to the mootness doctrine. *Ante,* p 425.

The cases cited in the opinion are inapplicable to the facts presented in the present case. In these cases the challenged regulation was withdrawn or repealed during litigation. See *United States v W T Grant Co,* 345 US 629; 73 S Ct 894; 97 L Ed 1303 (1953); *Los Angeles v Lyons,* 461 US 95; 103 S Ct 1660; 75 L Ed 2d 675 (1983).

Amendment to demonstrate a sufficient burden. In *NLRB*, the court addressed charges that had actually been filed, thus providing the necessary factual background against which the church's claims could be assessed.[37] See Tribe, *supra*, § 14-11, p 1230.

In any event, the requirement for applicants to submit a financial statement has been discontinued, and thus, the defendants' challenge to this regulation is moot.

### C. PROGRAM CONTENT

Although we have found the program director and financial disclosure requirements inappropriate subjects for declaratory action, we consider defendants' facial challenge to the regulation regarding *program content* ripe for review and hold it constitutionally invalid.[38]

The defendants claim that Rule 400.5106(1)(c),

---

[37] The summary in one of the briefs is as follows:

Three unfair labor practices charges have been filed with respect to the very schools involved in this case. In Case No. 25—CA—7932—3 filed May 7, 1976, with NLRB Region 25, Indianapolis, Indiana, for example, the Union charged that the Diocese committed an unfair labor practice when it refused to offer a teacher a contract. The Diocese responded that the teacher's contract was not renewed because inter alia she exposed biology students to sexual theories of Masters and Johnson that were contrary to the teachings of the Catholic Church. In Case No. 25—CA—7932, filed May 4, 1976, with NLRB Region 25, Indianapolis, Indiana, to cite another example, a similar charge was filed because the Diocese refused to renew a teaching contract. The Diocese responded that the teacher's contract was not renewed because the teacher married a divorced Catholic and was no longer in good standing with the Church. [*NLRB, supra*, p 1125.]

[38] The childcare organization act authorizes the DSS to promulgate rules regarding "programs . . . to assure the healthy physical, emotional, and mental development of children served." MCL 722.112(3)(f); MSA 25.358(12)(3)(f). More specifically, under 1980 AACS, R 400.5106(1) a childcare center,

concerning "positive self-concept" is unconstitutional on its face, has the potential as applied to the religious ministry of the defendants to impose a significant burden on the defendants' free exercise of religion, and is unconstitutionally vague.[39] While we would conclude that the question regarding application of the rule is not ripe for review, we agree with Justice Cavanagh that whether the regulation is void on its face can be addressed prior to enforcement.[40] *Ante,* p 419.

While Justice Cavanagh concludes that Rule 106 is unconstitutionally " 'overbroad, impinging on First Amendment freedoms,' "[41] and further that "[t]he overbreadth doctrine provides an independent, and wholly distinct, ground for deciding

---

[s]hall provide a program of daily activities . . . in the following areas:
  (a) Physical development, including large and small muscles.
  (b) Social development, including communication skills.
  (c) Emotional development, including positive self-concept.
  (d) Intellectual development.

[39] The Court of Appeals rejected the defendants' claim that the program rules were unconstitutionally vague, holding that Rule 400.5106(1)(c) was not contrary to the defendants' religious beliefs and only provided for the way children are to be handled, i.e., whether they are to be subjected to belittlement or demeaned by adults or made to feel inferior to other children. The panel concluded the defendants' concerns were about the *potential* for abuse in the "positive self-concept" rule and had failed to show any actual infringement, refusing to invalidate a statutory scheme merely because it might be subject to an unconstitutional interpretation. *DSS v Emmanuel Baptist Preschool,* 150 Mich App 254, 274-275; 388 NW2d 326 (1986).

[40] When a law is attacked facially on the grounds it is constitutionally overbroad, a claimant may successfully challenge a statute without the Court addressing the claimant's particular concerns. Justice Cavanagh declines to address the defendants' concern that the program content regulation imposes an impermissible burden on the free exercise of their religion, instead finding that the vagueness of the regulation threatens the constitutionally protected freedoms of speech and association.

[41] In this case the defendants do not claim that the regulation that childcare centers provide programs which assure healthy "emotional development, including positive self-concept," is unconstitutional in every conceivable application.

that Rule 106 is unconstitutionally vague,"[42] we do not reach the issue whether the statute is unconstitutionally vague since we find that it is void under the overbreadth doctrine.[43] *Ante,* p 422.

A statute will be considered unconstitutionally overbroad when it is written so broadly that there is a realistic danger the statute will compromise recognized First Amendment rights not before the Court.[44] The record supports the defendants' asser-

---

[42] It is true that where a statute abuts the sensitive areas of basic First Amendment freedoms the considerations which support the overbreadth doctrine may merge with those underlying a vagueness analysis. See *Kolender v Lawson,* 461 US 352, 359; 103 S Ct 1855; 75 L Ed 2d 903 (1983).

However, it is not clear whether the expanded scrutiny of a statute suggested in *Kolender* necessarily applies when facial challenges under the religion clauses are at issue, or is limited to laws which might "chill" rights to expression protected by the First Amendment. *Blackwelder v Safnauer,* 689 F Supp 106, 126, n 19 (ND NY, 1988), citing *Kolender,* 461 US 358, n 8.

In *Kolender* the United States Supreme Court held a loitering statute unconstitutionally vague on its face. The Court recognized that facial challenges to laws are permitted if a law reaches a "substantial amount of constitutionally protected conduct," seeming to reject the requirement that a statute must be found vague in all of its possible applications. See also *Keyishian v Bd of Regents of the State Univ of New York,* 385 US 589, 609; 87 S Ct 675; 17 L Ed 2d 629 (1967).

[43] Whether a statute is unconstitutional on its face can be determined on grounds either of vagueness or overbreadth, two closely related doctrines which are particularly important in dealing with free speech issues. Nowak, Rotunda & Young, Constitutional Law (3d ed), § 16.8, p 840. In addressing defendants' facial challenges of the rules, we would first determine whether the enactment of the program content regulation reaches a "substantial amount of constitutionally protected conduct," and, if so, the facial vagueness challenge need not be addressed. See *Village of Hoffman Estates v The Flipside, Hoffman Estates, Inc,* 455 US 489, 494; 102 S Ct 1186; 71 L Ed 2d 362 (1982); *Boos v Barry,* 485 US 312; 108 S Ct 1157, 1168; 99 L Ed 2d 333 (1988).

[44] *Members of City Council v Taxpayers for Vincent,* 466 US 789, 796-801; 104 S Ct 2118; 80 L Ed 2d 772 (1984).

tion that the rule would allow the state to determine what type of religious doctrine may appropriately be taught to preschool children and may compromise the defendants' freedoms of speech and religion.[45] Thus, we would hold that the program content rule is unconstitutional on its face because it is overbroad, and, as such, may not be applied to the defendants.

## IV. ESTABLISHMENT CLAUSE

Throughout the proceedings, the defendants have contended that the licensing requirements of 1973 PA 116 and the administrative rules promulgated thereunder violate the defendants' rights guaranteed by the Establishment Clause of the First Amendment. However, while we recognize that the violation of the Establishment Clause does not require a coercive act on the part of the state, in this case the licensing and regulations at issue do not constitute impermissible state involvement with the defendants' religious ministry, nor impermissible excessive government entanglement with religion.[46] *Lemon v Kurtzman,* 403 US 602; 91 S Ct 2105; 29 L Ed 2d 745 (1971).

---

[45] We find that the rule that their center includes activities which provide for a preschooler's "emotional development, including a positive self-concept" could give the state the right to determine what religious doctrine may appropriately be taught to the children at the center. Further, it is not mere speculation to fear that the state will interfere with defendants' religious program, since a consultant who inspected the school twice felt compelled to comment on the religious nature of the program.

[46] The Court of Appeals held that this case presented no Establishment Clause issue because that clause is only violated by aid to or sponsorship of religion. It has been argued, though, that an act as applied to a religious group can create excessive church-state entan-

CONCLUSION

The DSS may constitutionally require the defendants to comply with the licensure requirements of the childcare organization act, MCL 722.111 *et seq.*; MSA 25.358(11) *et seq.,* and certain administrative rules promulgated thereunder, in order to operate the preschool and day-care programs. Licensure and regulation are part of a neutral legislative scheme providing minimum standards to protect young children in care outside their own homes.

We would affirm the decision of the Court of Appeals that defendants are required to operate a licensed day-care center and to comply with the regulation prohibiting the use of corporal punishment. We would vacate those portions of the opinion addressing the regulations regarding program director qualifications, financial inspection, and program content.

BRICKLEY, J., concurred with BOYLE, J.

ARCHER, J. (*concurring*). I write to express agreement with Justice BOYLE in her analysis and result in each of the following issues: parts I, II, and IV, which address the licensing issue; part III (A), which addresses the program director issue; and

<hr>

glement, thus permitting a religious organization to use the Establishment Clause, like the Free Exercise Clause, as a shield from government intrusion. See *NLRB, supra.*

part III (B), which addresses the financial disclosure issue. However, I concur with Justice CAVANAGH in his analysis and result regarding the program content issue, found in part IV of his opinion.